[Crim. No. 14864.   Second Dist., Div. Two.   Mar. 20, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ERNEST WILLIAM KING, Defendant and Appellant.

Donald F. Roeschke, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

FLEMING, J.—First degree murder.

On 10 November 1966, payday at the Maness Excavating Company, Charles Lee Richards, the victim, cashed his pay check for $202.70, and remained on the company premises in Paramount from 4 to 8:30 p.m., drinking six to eight cans of beer with his fellow truck drivers. He was wearing levis and a red jacket. Later, Richards went with a fellow worker to a bar in Paramount, where Richards had several more beers. The two discussed going to another bar in Long Beach, but separated after leaving the first bar about 9:30 p.m.

That evening, defendant King, his codefendant Stewart, and Frances Herndon went in King's automobile to a bar in Long Beach called the Seven-O-Club. A man in a red jacket, apparently intoxicated, was seated at the bar drinking beer and paying the barmaid for his drinks from a roll of bills. Also seated at the bar was one Rue Romero. Around midnight King told Romero he would procure a girl for him later that evening. King said he had something to do first but would let Romero know when he was ready to deliver. About that time the barmaid concluded that the man in the red jacket was intoxicated, and she refused to serve him further, and she asked him to leave. King and Stewart then came up behind

the man and sought to gain his attention by pulling on his jacket, nudging him, and telling him they had something to show him outside. A few minutes later the man stumbled out of the bar, followed by King and Stewart.

On 11 November between 12:30 and 12:40 a.m. Stewart was seen entering an apartment courtyard at 620 East New York Street by a witness named Sanders. Sanders heard a cry for help from inside the apartment courtyard and two seconds later saw Stewart run from the apartment entrance to the corner of the street. He also saw Romero drive up, stop his automobile, and go over to number 620. King then walked out of the apartment entrance, and King and Romero got into the automobile and drove off. Meanwhile Stewart ran from the corner of the street to the Seven-O-Club bar and went inside. Sanders followed him inside and there saw Stewart counting a roll of money in the presence of Frances Herndon. After Stewart gave her $100 in twenty-dollar bills and told her to give them to King, Stewart left the Seven-O-Club and started running down the sidewalk.

At 12:46 a.m. two police officers in a patrol car saw Stewart running on the sidewalk, and since the area was one with a high incidence of robberies and assaults, they pulled their vehicle into a driveway to block the sidewalk ahead of Stewart's path. At that moment Romero and King drove into an adjoining parking lot. Stewart ran to the side of Romero's automobile and climbed into the back seat, where he was seen by one of the officers pushing down with his arm at the right side of the seat. The police asked the three men in Romero's automobile to get out, and as they got out one of the officers saw what looked like currency lodged between the rear seat cushion and the right side of the automobile. After securing permission from Romero to search the automobile, he discovered $89 in currency in the right rear of the automobile. At that moment Sanders appeared on the scene and told the police what he had seen at 620 East New York Street. The police radioed for the assistance of another patrol unit, and a second unit went to the East New York Street address, where it found the body of a man wearing levis and a red jacket who had been stabbed to death. There was no wallet or identification on the body.

King, Stewart, and Romero were arrested for robbery and murder and handcuffed. King attempted to escape by running away, but when shots were fired at him he stopped running. Meanwhile Frances Herndon and a man named Anthony An-

dino left the Seven-O-Club in King's automobile. The two were stopped and taken into custody by the police, and Frances Herndon handed over to the police the $100 she had received from Stewart. The following day the dead man was identified as Richards. The autopsy showed he had been moderately to severely intoxicated at the time of his death.

While in custody King was interrogated by the police for the first and only time on the morning of 14 November. After he had been advised of his rights, King told the police he had asked the victim if the latter wanted a prostitute, and that he and Stewart, who always hustled together, had escorted the victim to 620 East New York Street, intending to rob him. When they reached that address he struck the victim in the face. Stewart hit him several times in the back, and the victim fell to the ground. Stewart then left with a wallet in his hand. He himself left the scene with Romero in the latter's automobile. A few moments later they saw Stewart on the street and stopped to pick him up. King's statement was stenographically transcribed and signed by him the following day. At the trial his statement was admitted in evidence against him.

■ *Sufficiency of the Evidence.* King's statement to the police admitted his participation in a robbery in which the victim was killed by another participant. Under section 189 of the Penal Code the malice required for first degree murder is imputed when the killing occurs during the course of a robbery. (*People* v. *Washington,* 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130] ; *People* v. *Coefield,* 37 Cal.2d 865, 868-869 [236 P.2d 570].) All the prosecution had to prove, therefore, was that King intended to rob the victim when the killing occurred, and King admitted that intent. The circumstances surrounding the killing fully corroborated King's statement of intent. The victim, drunk and exposing a roll of bills, was an obvious mark for hustlers. The testimony of Frances Herndon, Rue Romero, and the barmaid pointed to both an attempted robbery and an actual robbery. Stewart had concealed $89 in currency for himself, and he had given Frances Herndon $100 for delivery to King. According to the testimony of Frances Herndon, the arresting officer, and the booking officers, King was not intoxicated that night. On the basis of this testimony and on the results of a breathalyzer test given King after his arrest, a forensic chemist gave his opinion that King was not intoxicated at the time of the killing. We conclude there was sufficient evidence to support the jury's verdict of first degree murder.

■ *Legality of Arrest.* King argues that the incriminating statement used to support his conviction was the product of an illegal arrest. We disagree. Given the observation of Stewart running, after midnight, in an area notorious for muggings and robberies, temporary detention for investigation of the occupants of Romero's automobile was lawful, even though the circumstances did not initially give the officers probable cause to make an arrest. (*People* v. *Stout,* 66 Cal.2d 184, 191-192 [57 Cal.Rptr. 152, 424 P.2d 704]; *People* v. *Mickelson,* 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Blodgett,* 46 Cal.2d 114, 116-117 [293 P.2d 57]; *People* v. *Martin,* 46 Cal.2d 106 [293 P.2d 52]; *People* v. *Manis,* 268 Cal.App.2d 653, 659-660 [74 Cal.Rptr. 423]; *People* v. *Henze,* 253 Cal.App.2d 986, 988 [61 Cal.Rptr. 545].) The police observed Stewart apparently concealing something in the rear seat, and one of the officers saw what looked like currency wedged next to the seat. Thereafter, with the consent of the owner the police searched the automobile and found a roll of currency pushed down between the rear seat and the side of the automobile. After the discovery of the currency, Sanders stepped forward and told the police what he had witnessed. Sanders' narrative, supported by the officers' own observations and discovery of the money, justified temporary detention of the suspects pending an investigation at 620 East New York Street; and the subsequent discovery at that address of the body of a man stabbed to death justified the arrest of the suspects. Sanders was not an untested informant as that phrase is understood in the law, but a witness on whom the police could rely without corroboration. (*People* v. *Gardner,* 252 Cal.App.2d 320, 324-325 [60 Cal. Rptr. 321]; *People* v. *Griffin,* 250 Cal.App.2d 545, 550-551 [58 Cal.Rptr. 707]; *People* v. *Lewis,* 240 Cal.App.2d 546, 549-551 [49 Cal.Rptr. 579].)

■ *Delay in Arraignment.* King also argues that his incriminating statement should not have been received in evidence because it had been obtained during a period of unnecessary delay in arraignment, in violation of his rights under Penal Code, section 825.[1] King was arrested early Friday

---

[1]Section 825, Penal Code, reads in part: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and in any event, within two days after his arrest excluding Sundays and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following."

morning and arraigned for murder on Tuesday morning. His incriminating statement was given to the police on Monday morning. Because Friday was Veterans' Day and Saturday and Sunday were holidays, his arraignment took place within the maximum period of two working days specified in section 825. While unnecessary delay in arraignment does not automatically require the exclusion from evidence of statements made during the period of delay (People v. Combes, 56 Cal.2d 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4]; Rogers v. Superior Court, 46 Cal.2d 3, 9-11 [291 P.2d 929]), neither does arraignment within the two-day maximum period of the statute sanctify the delay in all cases. Although the statute authorizes delay in arraignment up to a maximum of two working days, the delay must be necessary, and a lesser period of delay, if unnecessary under the circumstances, may contravene the statute. (People v. Powell, 67 Cal.2d 32, 58 [59 Cal. Rptr. 817, 429 P.2d 137]; Dragna v. White, 45 Cal.2d 469, 473 [289 P.2d 428].) Accordingly, we must look at the circumstances of the particular delay in order to determine its validity.

In considering whether a particular delay is justifiable under the law, section 825 should be read in conjunction with section 849 of the Penal Code, which permits a peace officer to release an arrested person from custody if he is satisfied that no ground exists for a criminal complaint. One valid reason for delay, therefore, is to make certain that ground exists to support a criminal complaint. When several arrested persons are jointly suspected of involvement in the same crime, a reasonable delay in arraignment in order to evaluate the case against each of them would appear to qualify as necessary delay within the meaning of the Penal Code. (Cf. People v. Powell, supra, p. 60.)

In the present case King was arrested early Friday morning on suspicion of murder. Arrested at the same time were four other murder suspects—Stewart, Romero, Frances Herndon, and Anthony Andino. Friday, Saturday, and Sunday were holidays, but nevertheless the police went forward with their investigation of the case. Friday they went to the scene of the crime in an attempt to find the victim's wallet and thereby discover his identity and to locate additional witnesses. Over the weekend they interviewed all the suspects except King and obtained statements from each of them. On Monday morning at 9:30 a.m. the officer in charge of the investigation, Vogel interviewed King, secured certain admissions from him, and had him repeat them before a stenog-

rapher. He finished his interview with King around noon. At 1 p.m. Vogel consulted an assistant district attorney in order to review the evidence against each of the five suspects. At the conclusion of his consultation about 5 p.m. he was advised by the assistant district attorney to file murder charges against Stewart and King only. The assistant said he would prepare a murder complaint and have it ready in the morning, and he asked Vogel to find out if King would sign the statement he had already dictated. Next morning King was asked to sign his statement and did so, and about 11 a.m., the regular time for morning arraignment in Long Beach, he was arraigned on a complaint for murder.

The circumstances of this case show a proper exercise of the authority implicitly given by statute to delay the arraignment of a person arrested on a serious charge for a reasonable period of time, not in excess of two working days, in order to evaluate the ground in support of the charge. The charge of murder is generally considered to be the most serious of all criminal charges, and it should not be publicized lightly or casually. Here, five persons were suspected of complicity in the murder of an unidentified man, and the police and the prosecutor used the period between the arrest of the five and the arraignment of two of them to discriminate between those suspects who would be publicly charged with murder and those who would not. The delay in arraignment appears to have been brought about, not for the purpose of eliciting damaging statements from an accused, but rather for the purpose of untangling a skein of circumstantial evidence which implicated five suspects in varying degrees and rationally determining from the weight of available evidence which of the five suspects should be publicly charged with murder. The circumstances are thus quite different from those in *Powell, supra,* where there was little doubt about the number and identity of the participants in the killing, where the accused were held by the police without arraignment for a longer period than two working days, and where the accused were repeatedly questioned by the police in a series of separate interrogations. No such abuses occurred in the case at bench.

Judgment affirmed.

Roth, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 14, 1969.