[Crim. No. 3468. Fourth Dist., Div. Two. Jan. 15, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT EDWARD LEE, Defendant and Appellant.

## COUNSEL

Samuel Frizell, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and William V. Ballough, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**TAMURA, J.**—Following a jury trial defendant was found guilty of attempted murder (Pen. Code, § 187) and was sentenced to state prison. He appeals from the judgment of conviction.

The offense was committed in the early morning hours of March 9, 1968, in LaHabra in an apartment rented to one William Brooks. Brooks operated a billiard parlor nearby. The victim, Marie Siuro, had been living with Brooks since January. About 8 or 8:30 p.m. on March 8 Brooks received a telephone call from Marie in which she stated that she had been beaten and was badly bruised. Brooks told her to call the police and her parents. That night Brooks closed his billiard parlor at midnight, visited his daughter until 2 a.m. and returned to his apartment. As he entered the hallway he observed "blood all over the place" and found Marie lying on the bathroom floor. She was covered with blood, unconscious and breathing heavily. Brooks called the police and Marie was taken to the hospital where an examination revealed a severe head injury with lacerations and bruises about her head and face. She was unable to move her right upper and lower extremities, indicating brain damage. She remained unconscious for two or three months. The examining doctor testified that the injuries could have been caused by someone kicking the victim. At the time of trial, vision from Marie's left eye appeared to be permanently impaired and it was extremely doubtful that she would ever be able to walk.

The evidence connecting defendant with the crime may be summarized as follows: On the morning of March 8 defendant and Marie checked into a motel in East Los Angeles. About 7:30 that evening the motel manager saw Marie run out of her room; he noted that she had a black eye and a

bruised cheek. Shortly thereafter defendant appeared and asked the manager where Marie had gone. The manager pointed in a direction opposite to the one she had taken and defendant stated that he knew where she was and that he was going after her. After defendant drove off, Marie returned and said she was going to call a cab.

At about 9 or 9:30 p.m. the owner of the apartment complex in La-Habra where Brooks resided saw defendant ring the doorbell of Brooks' apartment. Defendant got no response and asked the manager where the occupant could be found. The owner directed defendant to the billiard parlor. That evening William Brooks' brother, Murray, saw defendant at the billiard parlor. Defendant inquired about the owner, used a telephone, and left.

About 11:30 p.m. a taxi driver picked Marie up in East Los Angeles and dropped her off about midnight in front of Brooks' apartment in LaHabra. About 1:45 a.m. the apartment owner's 18-year-old daughter saw defendant near Brooks' apartment. She later heard footsteps on the driveway and the sound of a vehicle driving off.

Defendant resided at his wife's house in Montebello next door to Mr. and Mrs. Fontes. On March 16 the Fontes found a pair of work shoes in the shrubbery of their front yard. They had heard that defendant's wife had been looking for the shoes so they gave them to her.

Defendant's father testified that some 15 days after defendant was arrested he called from the county jail stating that he had hidden a pair of work shoes in the neighbor's yard and asked his father to look for them. The father told defendant's wife about the call and she stated that she had the shoes.

The district attorney eventually obtained possession of the shoes and had them examined by a criminalist. The criminalist testified that the shoes were heavily stained with human blood of the same group and type as Marie's, that the heaviest concentration of blood was on the heel and sole with a fairly large amount on the toe, that a bloody footprint found in the hallway of Brooks' apartment appeared to have the same sole pattern as one of the shoes, and that blood of the same type was found on the floor mat of defendant's vehicle. In addition, the criminalist found human hair on the shoes which matched samples removed from Marie's head.

Defendant was arrested on Saturday afternoon, March 9. That afternoon, defendant was advised of his rights and interviewed. Defendant admitted registering at the motel in East Los Angeles with Marie, and striking her in the course of an argument. He denied having gone to LaHabra on the evening of March 8 but when he was told that he had been seen near

Brooks' apartment, he admitted being there early in the evening. He stated he went from Brooks' apartment to the billiard parlor, then to his wife's house in Montebello, and then to his parents' home. At those interviews defendant stated that on the evening of March 8 he was wearing a pair of wing-tipped dress shoes and the same clothing he had on at the time of his arrest.

At 1 p.m. on Monday, March 11, defendant was interviewed by an investigator from the district attorney's office. After proper advisements and waiver of rights defendant gave the same version of his activities on the night of March 8. He stated that he called Marie from his parents' home but that she hung up, that about 1 a.m. he went out looking for a restaurant, that he drove to his wife's house and sat in his car until 2 or 2:15 a.m. before entering the house.

Around 9:30 p.m., March 11, defendant initiated a conversation with a police officer who was making a jail check and offered to show the officer where the clothing he was wearing on March 8 was located. At defendant's request the officer took him to his father's residence where he pointed out certain items of clothing which were in a garage. The officer took the items to the sheriff's crime laboratory for checking.

Defendant was again interrogated by the district attorney's investigator at 2:20 p.m., Tuesday, March 12. After being warned of his rights, defendant stated that he had thrown away the trousers he was wearing on the night of March 8 because he had spilled oil on them and that he had also thrown away a pair of work shoes for the same reason. He did not recall where he had discarded his shoes. He also said that he had beaten Marie on at least eight prior occasions.

Defendant testified in his own behalf in substance as follows: He and Marie registered at the motel in East Los Angeles on March 8. They had an argument, he struck her, and she ran out of the motel. He went to the apartment in LaHabra and spoke to the owner, then went to Brooks' billiard parlor and then to his wife's house in Montebello where he remained until midnight. He then went to his parents' home and telephoned Marie. She told him that she was having trouble with the person with whom she was living and asked him to pick her up. During the conversation he overheard someone tell Marie, "Is that him?" and "Hang up on him and don't ever talk to him again." Defendant called again and his mother talked to Marie. Marie again asked defendant to pick her up and he agreed to do so. En route to Brooks' apartment he picked up a hitchhiker. Upon arriving at Brooks' apartment he rang the doorbell but no one responded. As he was returning to his car he observed someone attempting to unlock the door to Brooks' apartment. He took the hitchhiker home and returned

to the apartment. The door was open and the lights were on. He entered and saw Marie lying on the bathroom floor. He became frightened and left immediately for his wife's house in Montebello arriving there about 2:30 a.m. He noticed blood on his shoes so he hid them in the neighbors' yard because he felt he might be a "logical suspect." Defendant admitted that the shoes which had been introduced into evidence belonged to him and that they were the ones he was wearing on the night in question.

Defendant does not challenge the sufficiency of the evidence to support his conviction. He seeks a reversal on the following grounds: (1) Statements taken from him on March 11 and 12 should have been excluded because there was an unreasonable delay in taking him before a magistrate; (2) his shoes should have been suppressed as evidence because they had been illegally seized by the district attorney; (3) certain testimony elicited from representatives of the public defender should have been excluded on the basis of an attorney-client privilege; and (4) the court erred in making certain comments to the jury concerning Marie's competency as a witness.

## I

Defendant was arrested on Saturday afternoon but was not arraigned until Wednesday. Defendant urges that he should have been taken before a magistrate on Monday morning and, therefore, statements taken from him on Monday and Tuesday afternoons should have been excluded as fruits of an illegal detention.

Saturdays and Sundays being judicial holidays, in the instant case the statutory two-day period did not commence until Monday and did not expire until midnight Tuesday. Courts not being in session at midnight, arraignment on Wednesday did not exceed the statutory maximum provided by section 825 of the Penal Code.[1] (*People* v. *Chambers* *(Cal.App.) 275 A.C.A. 435. See *People* v. *Ross,* 236 Cal.App.2d 364, 368 [46 Cal. Rptr. 41].) Thus the statements taken on Monday afternoon and at 2:20 p.m. Tuesday were obtained within the two-day statutory maximum.

Under certain circumstances even a delay within the statutory maximum may be patently unreasonable. (See *People* v. *Powell,* 67 Cal.2d 32, 59 [59 Cal.Rptr. 817, 429 P.2d 137]; *Dragna* v. *White,* 45 Cal.2d

[1]Section 825 of the Penal Code provides, in pertinent part as follows: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day.immediately following."

*A rehearing was granted on August 26, 1969. The final opinion is reported in 276 Cal.App.2d 89 [80 Cal.Rptr. 672].

469, 473 [289 P.2d 428].) ■ This is not such a case. ■ The victim here was unconscious and unable to identify her assailant and the evidence against defendant was circumstantial. On Monday and Tuesday the police were engaged not only in checking out defendant's version of his activities on the night of March 8, but were also investigating the possible involvement of William Brooks and his brother, Murray Brooks.[2] Items of clothing and shoes which had been taken from the two men were being checked by the sheriff's crime laboratory. The police were also digging up fresh dirt that had been turned over in a field adjoining defendant's father's residence in search of defendant's shoes. In the foregoing circumstances the failure to arraign defendant before 2:20 p.m., March 12, cannot be deemed to have been unreasonable as a matter of law. (*People* v. *King,* 270 Cal. App.2d 817, 822 [76 Cal.Rptr. 145]; *People* v. *Haney,* 249 Cal.App.2d 810, 815-816 [58 Cal.Rptr. 36].) ■ "In considering whether a particular delay is justifiable under the law, section 825 should be read in conjunction with section 849 of the Penal Code, which permits a peace officer to release an arrested person from custody if he is satisfied that no ground exists for a criminal complaint." (*People* v. *King, supra,* 270 Cal. App.2d 817, 822.) Section 849 of the Penal Code implicitly permits a reasonable delay in the arraignment of a person arrested on a serious charge where such delay is necessary to make a proper evaluation of the evidence supporting the charge. (*People* v. *King, supra,* p. 823.)

■ Even assuming, *arguendo,* that the delay was unreasonable, it does not follow that the statements were inadmissible. ■ An unreasonable delay does not in and of itself render inadmissible a confession obtained during the period of such delay. (*People* v. *Lane,* 56 Cal.2d 773, 781 [16 Cal.Rptr. 801, 366 P.2d 57]; *People* v. *Kendrick,* 56 Cal.2d 71, 85 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Bashor,* 48 Cal.2d 763, 765 [312 P.2d 255]; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 10 [291 P.2d 929].) ■ California has not adopted the federal *McNabb* rule (*McNabb* v. *United States,* 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608]) that a confession obtained during a period of unreasonable delay in arraignment is ipso facto inadmissible. (*People* v. *Powell, supra,* 67 Cal.2d 32, 59-60;

---

[2]Murray Brooks worked for his brother at the billiard parlor and slept in the building in which the billiard parlor was located. He used William's apartment to shower and change clothes. He testified that on the evening of March 8 he went to William's apartment about 8 p.m. to shower and returned to the billiard parlor about 8:30, that after the billiard parlor closed he went to a bar where he remained until 2 a.m. and then he returned to his living quarters at the billiard parlor, and that at about 3:30 a.m. he was awakened by the police and questioned. He gave the police certain articles of clothing he had been wearing.

*People* v. *Hall,* 62 Cal.2d 104, 108, fn. 6 [41 Cal.Rptr. 284, 396 P.2d 700]; *Rogers* v. *Superior Court, supra,* p. 10.) Delay is but one of the factors to be considered in determining whether a confession is voluntary. (*People* v. *Kendrick, supra,* p. 85; *Rogers* v. *Superior Court, supra,* p. 10.) ■ Unreasonable delay in arraignment does not require a reversal unless defendant shows that by reason of such delay "he was deprived of a fair trial or otherwise suffered prejudice. . . ." (*People* v. *Powell, supra,* 67 Cal.2d 32, 60; *People* v. *Combes,* 56 Cal.2d 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4].)

■. In the case under review there is no suggestion that defendant's statements were involuntary under *Miranda* rules or in the traditional sense. The record discloses that defendant was properly advised of his rights and he voluntarily, knowingly and intelligently waived them. When defendant declined to discuss the matter further without first consulting an attorney, interrogation was terminated and he was not questioned thereafter. Defendant does not contend that his statements were coerced. His principal complaint concerns the use of statements made at 2.20 p.m. on March 12 wherein he, for the first time, said he was wearing work shoes on the night of March 8 and that he had thrown them away. Those facts, however, together with the discovery of the shoes, were established by the testimony of defendant's father and Mr. and Mrs. Fontes, independent of defendant's statements. Defendant also points to the prejudicial effect of an admission he made at that interview that he had beaten Marie on numerous prior occasions. That evidence, however, was merely cumulative. Defendant admitted striking Marie on the evening of March 8 and his admission was corroborated by testimony of independent witnesses.

The present case is unlike *People* v. *Powell, supra,* 67 Cal.2d 32. In that case defendants were arrested on Sunday but not arraigned until Wednesday. The police conducted a virtual round-the-clock process of interrogation, both before and after arraignment, without advising defendants of their constitutional rights. By employing coercive psychological techniques the police elicited 16 incriminating statements before arraignment in which defendants confessed to the crimes charged. The record disclosed a gross exploitation of the period of delay for the purpose of extracting from the mouths of defendants "an airtight case against them." It was in that setting that the court characterized the conduct of the police in holding defendants "for three days before they were arraigned, advised of their rights and furnished with counsel as the law requires" as a violation of defendants' "fundament right[s]" and as being "patently illegal." Because reversal was required for violation of *Escobedo-Dorado* rules, the Court stated that it was unnecessary to determine "whether the circumstances just described amounted to such prejudice as to render reversible the denial of

defendants' constitutional and statutory rights to prompt arraignment." (*People* v. *Powell, supra,* 67 Cal.2d 32, 61.)

We conclude that the statements taken from defendant on March 11 and 12 were properly received in evidence.

## II

■ We next consider defendant's contention that his shoes had been illegally seized by the district attorney and that, hence, their use as evidence should have been suppressed.

The issue was first raised in a pretrial motion to suppress under section 1538.5 of the Penal Code. Following an extended and exhaustive hearing, the motion was denied.[3] At the outset of the trial defendant's attempted renewal of a 1538.5 motion was denied with the stipulation that any objections to the introduction of the evidence which defendant might interpose during trial be deemed to be made on the grounds urged in the 1538.5 motion[4] and on the record of that proceedings. The trial judge indicated that he had read the record of the 1538.5 proceedings and that objections to the introduction of the evidence on the grounds therein asserted would be overruled.

We need not review in detail the evidence contained in the voluminous record of the 1538.5 proceedings. The salient facts pertaining to the admissibility of the shoes were as follows: After receiving the shoes from Mr. and Mrs. Fontes, defendant's wife gave them to an investigator from the public defender's office who in turn delivered them to the deputy public defender who had been assigned to represent defendant. Prior to the commencement of the preliminary hearing the public defender was relieved and private counsel was appointed to represent defendant. In order to avoid a charge of suppressing evidence and to prevent seizure of the evidence by the district attorney without a prior determination respecting the possible privileged character of the evidence, the deputy public defender delivered the shoes to Municipal Court Judge Moore with an understanding between the judge, the deputy public defender and a deputy district attorney that the evidence would be retained by the judge as a "private citizen" subject

[3]Defendant sought a writ of prohibition from this court to review the order denying the motion to suppress. The petition was denied (4th Civil 9255) and the Supreme Court denied a hearing.

[4]The attempted renewal of the 1538.5 motion at trial after a pretrial motion under the section had been made and denied, was properly denied. (*People* v. *O'Brien,* 71 Cal.2d 394, 403 [78 Cal.Rptr. 202, 455 P.2d 138, 79 Cal.Rptr. 313, 456 P.2d 969].)

to an appropriate judicial determination respecting their proper disposition.[5] The parties discussed with the judge the use of a search warrant as a possible vehicle for resolving the question.

Thereafter the district attorney elected to proceed against defendant by way of a grand jury indictment rather than by information. The district attorney obtained a search warrant from Judge Spiers, the then presiding judge of the criminal department of the superior court, and pursuant to the warrant obtained the shoes from Judge Moore. Thereupon Muncipal Court Judge Verry, before whom the preliminary examination had been rescheduled to be heard, issued an order enjoining the district attorney from using the shoes as evidence against defendant and ordered their return to Judge Moore. The district attorney countered by obtaining an order from Judge Spiers authorizing and directing the district attorney to present the evidence to the grand jury. Pursuant to Judge Spiers' order the district attorney presented the evidence to the grand jury and defendant was indicted. Meanwhile Judge Verry issued an order to show cause re contempt against the district attorney for violating his order. Judge Verry subsequently dismissed the contempt proceedings when he learned of Judge Spiers' order.

Defendant now asserts (1) that the State obtained possession of the evidence illegally in that, contrary to the agreement of the parties, the district attorney failed to disclose in the affidavit in support of the search warrant the terms of the agreement under which Judge Moore agreed to hold the evidence and (2) that the district attorney "flouted" Judge Verry's order by presenting the evidence to the grand jury.

Defendant's contentions are devoid of merit. The evidence respecting the precise terms of the agreement under which Judge Moore agreed to hold the evidence was conflicting. The judge who heard the pretrial 1538.5 motion to suppress found that the district attorney did comply with the agreement and, in ruling on the admissibility of the evidence at trial, the trial judge reviewed the record of the 1538.5 proceedings and impliedly reached the same conclusion. ■ Where there is substantial evidence to support a factual finding in a 1538.5 motion to suppress, such finding may not be disturbed on appeal. (See *People* v. *Harrington* * (Cal.App.) 81 Cal.Rptr. 103; *People* v. *Heard,* 266 Cal.App.2d 747, 749 [72 Cal.Rptr. 374]; *People* v. *Superior Court,* 264 Cal.App.2d 165, 166 [70 Cal.Rptr. 362].) ■ There was substantial evidence to support the finding that the district attorney complied with the agreement. Nor does the evidence support the contention that the district attorney "flouted" Judge Verry's order by presenting the evidence to the grand jury. The district attorney

---

[5]Judge Moore was the judge before whom a preliminary hearing had been scheduled to be heard.

*A hearing was granted by the Supreme Court on November 26, 1969. The opinion of that court is reported in 2 Cal.3d 991 [88 Cal.Rptr. 161, 471 P.2d 961].

acted pursuant to an order of the presiding judge of the superior court criminal department. In dismissing the contempt proceedings, Judge Verry observed that had he known of Judge Spiers' order he would not have initiated the contempt proceeding.

In any event, in the final analysis the controlling question is whether the State's seizure of the evidence violated defendant's rights. It did not. Neither the public defender nor substituted counsel for defendant had the right to withhold the evidence from the State by asserting an attorney-client privilege. It has been held "an abuse of a lawyer's professional responsibility knowingly to take possession of and secrete the instrumentalities of a crime." (*In re Ryder,* 381 F.2d 713, 714.) ■ A defendant in a criminal case may not permanently sequester physical evidence such as a weapon or other article used in the perpetration of a crime by delivering it to his attorney. Section 135 of the Penal Code provides: "Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor." In a well reasoned opinion in *State* v. *Olwell,* 64 Wn. 2d 828 [394 P.2d 681, 16 A.L.R.3d 1021], the Supreme Court of the State of Washington described the obligation of an attorney who receives such evidence from his client as follows: "The attorney should not be a depository for criminal evidence (such as a knife, other weapons, stolen property, etc.), which in itself has little if any, material value for the purposes of aiding counsel in the preparation of the defense of his client's case. Such evidence given the attorney during legal consultation for information purposes and used by the attorney in preparing the defense of his client's case, whether or not the case ever goes to trial, could clearly be withheld for a reasonable period of time. It follows that the attorney, after a reasonable period, should, as an officer of the court, on his own motion turn the same over to the prosecution." (*State* v. *Olwell, supra,* pp. 684-685.) ■ Although, as the Court held in *State* v. *Olwell, supra,* the fact that the client delivered such evidence to his attorney may be privileged, the physical object itself does not become privileged merely by reason of its transmission to the attorney. (Cf. *Suezaki* v. *Superior Court,* 58 Cal.2d 166, 176 [23 Cal.Rptr. 368, 373 P.2d 432, 95 A.L.R.2d 1073]; *San Francisco Unified School Dist.* v. *Superior Court,* 55 Cal.2d 451, 457 [11 Cal. Rptr. 373, 359 P.2d 925, 82 A.L.R.2d 1156]; *Holm* v. *Superior Court,* 42 Cal.2d 500, 507-508 [267 P.2d 1025, 268 P.2d 722].)

■ We conclude that the State's seizure of the shoes by search warrant was valid (Pen. Code, § 1524) and that objections to their introduction into evidence were properly overruled.

### III

Defendant's related contention that testimony from representatives of the public defender's office that they received the shoes from defendant's wife and delivered them to Judge Moore should have been excluded on the basis of an attorney-client privilege is equally devoid of merit.

The statute protects "confidential communication between client and lawyer" (Evid. Code, § 952). However, the privilege does not protect information coming to an attorney from a third person who is not a client unless such person is acting as the client's agent. (*D. I. Chadbourne, Inc.* v. *Superior Court,* 60 Cal.2d 723, 737 [36 Cal.Rptr. 468, 388 P.2d 700]; *City & County of San Francisco* v. *Superior Court,* 37 Cal.2d 227, 236-237 [231 P.2d 26, 25 A.L.R.2d 1418]. See 8 Wigmore, Evidence (1961) 618, 619.) Here the testimony did not involve disclosure of confidential communications between defendant and his counsel. There is no evidence of an attorney-client relationship between defendant's wife and the public defender's office, nor any evidence that in delivering the shoes to the public defender the wife was acting as defendant's agent or under his direction.[6]

### IV

Defendant contends that the court made improper comments touching on the credibility of the victim's testimony.

The record reveals that after the jury was selected, the court convened, without the jury, at the Orange County Medical Center for the purpose of determining Marie's competency to testify. Following the hearing, the judge concluded that she was competent to testify. Marie was called by the prosecution and, after she was sworn as a witness, the judge made the following comments to the jury:

"As you are aware from the opening statement of Mr. Freeman, she has suffered very severe brain damage.

"·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·

"As of that time I determined [yesterday] that she was, in a limited way, competent to be a witness.

"My determination only was that as of that time, and, hopefully, today;

---

[6]There was no objection in the trial court nor any suggestion before this court that the testimony resulted in a violation of the marital privilege; consequently, we need not consider that issue. (*People* v. *Mathis,* 63 Cal.2d 416, 426 [46 Cal.Rptr. 785, 406 P.2d 65].) Although defendant was living at his wife's house, their relationship was estranged.

that she had in a limited way, the ability to perceive, to recollect, and to communicate.

"As you will discover, this is going to be a very distressing experience for you people. It is extremely limited.

"The fact that I have made that determination is in no way binding upon you.

"It will be for you to determine, as the triers of fact in this case, whether in fact she did perceive accurately, whether in fact she does recollect, and whether in fact she is communicating either accurately or truthfully.

"These are questions of credibility."

Defendant made no objections to the court's comments. Thus the issue may not be raised for the first time on appeal. (See *People* v. *Hamilton*, 251 Cal.App.2d 506, 511 [59 Cal.Rptr. 459].) Moreover, in the circumstances, the judge's comments were clearly within the scope of the court's constitutional power to comment on the credibility of a witness. (Art. VI, § 10, Cal.Const.) The judge's observation that Marie had suffered severe brain damage was nonprejudicial. That fact must have been apparent to the jury from her physical appearance and demeanor on the stand; moreover, it had been established by uncontradicted medical testimony.

Judgment is affirmed.

Kerrigan, Acting P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 11, 1970.