Billings, Thomas P., J.
The defendant is charged with being an accessory before the fact to armed masked robbery (four counts) and with conspiracy to commit armed masked robbery. The charges stem from the December 26, 2010 robbery of the jewelry counter in the Kohl’s department store in Woburn. The robber was the defendant’s brother Dominic Cinelli, who subsequently died in an exchange of gunfire with Woburn police officer John Maguire, who also died.
The defendant has moved to suppress certain evidence relating to a cellular phone. For the reasons that follow, the motion is DENIED.
*194 FINDINGS OF FACT
At an evidentiaiy hearing on April 9, 2014,1 heard testimony from four witnesses (Attorney William Cintolo, Trooper Michael Banks and Sergeant Peter Sennott of the State Police, and Mary Ann Maniscalco), and received three exhibits. Based on the credible evidence and the reasonable inferences therefrom, I. find the following facts.
1. The Kohl’s robbeiy and the shooting of Officer Maguire sparked an immediate and intensive investigation by the Middlesex District Attorney’s office, state troopers assigned to the DA’s investigative unit, and the Woburn police. Having taken judicial notice of the file in a related case (Commonwealth v. Hanright, MICR 2011-301), I am aware that warrants to retrieve Dominic Cinelli’s cell phone, to obtain his service provider’s records of calls to and from the phone, and to search the phone itself were all obtained on or before December 30, 2010, and executed promptly.
2. At the time of the robbeiy, the defendant was recuperating at the Newbuiyport home of his ex-wife, Maiy Ann Maniscalco, from hip surgeiy four days earlier. The two had divorced in 2007 or thereabouts. Evidently, the defendant quickly learned of the disastrous aftermath of his brother’s robbeiy of the Kohl’s store
3. On the night of the robbeiy (December 26) the defendant possessed and used a cell phone with the number 617-312-2195 (the “2195 phone”), whose service was provided through Maniscalco’s Verizon family plan. Maniscalco went to her job as a nurse that evening, but first made sure that the defendant was' comfortable, that he had something to eat, and that he had his phone by his bedside. Later that evening, she called him several times from work on the 2195 number to check on his well-being. He answered each time.
4. At some time that evening, the defendant called William Cintolo, an attorney whom he had known for thirty years or more and whom he had retained as his counsel from time to time, to arrange a meeting. The defendant told Cintolo that he wished to give him his cell phone for safekeeping and that it contained exculpatory information. Cintolo told him he should shut the phone off and not use it again. They agreed to meet the next day in the parking lot of a Dunkin’ Donuts store in Revere.
5. Maniscalco drove the defendant to the meeting the next day at the Dunkin’ Donuts. She knew that the purpose of the meeting was for the defendant to turn his cell phone over to Cintolo “so that it would be safe,” and I infer that she learned this in a conversation with the defendant. She pulled up next to Cintolo, who was in his vehicle waiting for them. The defendant and Cintolo each exited their vehicles and walked to the edge of the lot. Maniscalco stayed at her car, out of earshot.
6. The defendant and Cintolo now had a private conversation in which the defendant solicited, and Cintolo provided, legal advice. The defendant also gave Cintolo the 2195 phone, reiterating that the phone contained exculpatory information, that he expected to be arrested, and that he wanted Cintolo to preserve the integrity of the information on the phone. Cintolo agreed to do so. As Cinelli had requested, the phone was powered down when the defendant handed it over to him, and Cintolo, wishing not to compromise the exculpatory evidence in any way, did not turn it on, then or ever.
7. The meeting lasted about five minutes. Cintolo took the phone back to his Boston law office, and consulted with his partner Atty. Thomas Kiley about what he should do with it. They ended up placing it in a manila envelope and securing it in a locked drawer in Kiley’s desk.
8. Cintolo and the defendant had other privileged conversations after this. Cintolo did not testify at the hearing concerning when, where, or about what, except to say (and I find) that he did not request, and the defendant did not expressly provide, authorization to turn the phone over to the police.
9. The attention of law enforcement was soon drawn to the defendant, likely (1 infer) through their examination of Dominic Cinelli’s phone, or perhaps in some «other way. In any event, a warrant was obtained for ■the defendant’s arrest. The warrant was executed at 'Maniscalco’s Newbuiyport home on January 7, 2011, ■ and the defendant was taken into custody.
i 10. The police knew by this time that the defendant had been using a cell phone on December 26; they knew the phone number; and they believed the defendant had used it to communicate with his brother Dominic. They did not know where the phone was, but they were very interested in acquiring it.
11. Maniscalco was home at the time of the defendant’s arrest. The police asked her consent to a search of the house except for the defendant’s private space, and she gave it. The police obtained a search warrant from the Newbuiyport district court to search the home in its entirely for the defendant’s cell phone, and returned later the same day to execute it.
12. Trooper Banks, a member of the search team, asked Maniscalco where the defendant’s cell phone was. She pointed him to it, but told him it was not the phone that the defendant had in his possession on December 26. She added that the other phone, which the defendant had used for years, was lost just after the Kohl’s incident, so he had gotten a new one.
13. This was the first the government knew that the defendant’s phone was not at the location where he had been staying. The police did not accept Maniscalco’s explanation at face value.
14. Maniscalco was summoned into the grand jury on January 11, where she was represented by Atty. *195 Elliot Weinstein. Before she testified, the police made it known that they were keenly interested in the whereabouts of her ex-husband’s cell phone.
15. That day, Cintolo received a frantic call from Maniscalco, who said the police were accusing her of lying about the phone and threatening to put her in jail if she didn’t come clean. He told her, “Tell them the lawyer has it.”
16. Believing that Weinstein would need the information in order to represent Maniscalco effectively, Cintolo had told him in an earlier telephone conversation that his firm was in possession of the defendant’s phone and that he believed it contained information that would tend to exculpate the defendant. Now, Weinstein told Det. Sennott, who was present at the courthouse, that Atty. Riley could tell him where to find the phone they were looking for, and gave him Riley’s phone number. This was when the investigators first learned the whereabouts of the phone.
17. Maniscalco was asked in the grand jury about the location of the phone that the defendant was using on December 26. She testified that Cintolo had it. [1]
18. Sennott called Riley’s number. He was connected to Cintolo, who told him the phone was at the firm and the police could come pick it up, provided they would agree to provide him with a “mirror” copy of the contents. After consulting with then-ADA Ryan, Sennott agreed.[2]
19. Sennott, accompanied by Sgt. William Donoghue, went to Cintolo’s office, met with him briefly, and retrieved the phone from him. Cintolo did not tell Sennott where he got it, or when.
20. On the afternoon of February 9, 2011 Tpr. Banks called Cintolo to discuss the cell phone he had turned over to Sennott. Cintolo told Banks that he had received the phone taken it for safekeeping with the understanding that it contained exculpatory evidence; that he could not tell Banks why he believed this; that he had advised Maniscalco to tell the police that he had the phone; and that it was powered off at the time and he had never turned it on. Cintolo did not tell Banks how he had come into possession of the phone.[3]
RULINGS OF LAW
The defendant moving to suppress has the burden of proving, by a preponderance of the evidence, that there was a search in the constitutional sense; “[t]hen, but only then, the government has the burden to show that its search was reasonable and therefore lawful.” Commonwealth v. Pina, 406 Mass. 540, 544 (1990). There was only a search in the constitutional sense if there was state action. “Evidence discovered and seized by private parties is admissible without regard to the methods used, unless State officials have instigated or participated in the search.” Commonwealth v. Leone, 386 Mass. 329, 333 (1982); see Commonwealth v. Arruda, 73 Mass.App.Ct. 901, 904 (2008) (‘The State action requirement of art. 12 is well established. It is governmental, not private, compulsion that is prohibited”).
The specific issues presented by the motion are largely resolved by the SJC’s decision in Commonwealth v. Brandwein, 435 Mass. 623 (2002). There, the defendant’s treating psychiatric nurse persuaded him to turn his gun over to her. When a police officer arrived to speak with her, the nurse
told [the officer] that the defendant had brought a gun to the clinic, and that she had locked the gun in her office . . . [She later] turned over the defendant’s gun and ammunition, and provided [the officer] with more detail concerning the defendant’s visit — that the defendant had arrived in a distraught and suicidal state, that he had had a gun, that he had turned over the gun on request, that he had admitted to robbing a bank, and that he had been burned when the stolen money had “exploded.”
435 Mass. at 626.
This information contributed to the defendant’s arrest and his subsequent statement, which he sought to suppress as “fruit of the poisonous tree.” The SJC noted that the nurse had come forward on her own, with the police doing nothing “to solicit, provoke, or tempt [her] into making her disclosures.” ‘That a private party may have breached some obligation of confidentiality in volunteering information to the police does not require the police to ignore that information.” The exclusionary rule, whose purpose is “to deter future unlawful police conduct,” has no application to unsolicited conduct by individuals outside law enforcement, and “is not intended ‘to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.’ ” Therefore, “[e]vidence discovered and seized by private parties is admissible without regard to the methods used, unless State officials have instigated or participated in the search.” This is true of both physical evidence and information, even when the person producing it has violated a privilege in turning it over. 435 Mass, at 631-32 (citations omitted).
In this case the police, not knowing where or with whom the defendant’s phone might be, understandably focused on Maniscalco as someone who likely had the answer. They reasonably suspected her stoiy that the phone had been “lost” soon after the Rohl’s robbeiy. It was not misconduct to pursue the issue with her, or to point out (as they likely did, presumably with her counsel present) that misleading a criminal investigator is a crime.
Cintolo, by accepting the defendant’s phone and agreeing to be its custodian, had put himself in a difficult position, one fraught with “complex and conflicting ethical and legal obligations.” Maine Board of Overseers of the Bar, Opinion No. 60 (September 4, 1985); see cases cited in note 4, infra. In one respect, *196 Cintolo’s obligations were somewhat clearer than in many cases: his client had entrusted the phone to him with the instruction that he was to preserve it and the exculpatory evidence it contained. Implied in this was the assumption that the phone’s contents were to be revealed at some point.
Indeed, Cintolo would have been obligated to turn the phone over to law enforcement — or refuse to take it in the first place — even without his client’s instruction. “A defendant in a criminal case may not permanently sequester physical evidence such as a weapon or other article used in the perpetration of a crime by delivering it to his attorney.” People v. Superior Court, 192 Cal.App.3d 32, 35, 237 Cal.Rptr. 158, 159 (1987). The other side of the coin, of course, is that “[a]n attorney may not act as a depository for criminal evidence, and he may not suppress such evidence.” State v. Dillon, 93 Idaho 698, 710, 471 P.2d 553, 565 (1970), cert. denied, 401 U.S. 942 (1971). As an early and oft-followed case on the subject put it,
The attorney should not be a depository for criminal evidence (such as a knife, other weapons, stolen property, etc.), which in itself has little, if any, material value for the purposes of aiding counsel in the preparation of the defense of his client’s case. Such evidence given the attorney during legal consultation for information purposes and used by the attorney in preparing the defense of his client’s case, whether or not the case ever goes to trial, could clearly be withheld for a reasonable period of time. It follows that the attorney, after a reasonable period, should, as an officer of the court, on his own motion turn the same over to the prosecution.
State ex rel. Sowers v. Olwell, 64 Wash.2d 828, 833-34, 394 P.2d 681, 684-85 (1964).
There is broad, though not quite universal, consensus on this.[4] Attorneys who have declined to come forward with physical evidence obtained from their clients have been found in contempt, January 1976 Grand Jury; struck from the rolls, Ryder, and prosecuted, Stenhach (all supra, note 4).
“Although the physical item itself is not privileged,” of course, “the accompanying communications ordinarily are privileged.” Rubin, 325 Md. at 574. Finally, because even the act of producing real evidence may in some circumstances be testimonial and incriminating, see Commonwealth v. Doe, 405 Mass. 676, 679 (1989), and cases cited, the attorney who obtained the item from his client ordinarily should not divulge the source, and the prosecution should not disclose in the juiy’s presence the fact that it obtained the item from the defendant’s attorney.[5] See, e.g., Morrell, 575 P.2d at 1207, 1210; Lee, 3 Cal.App.3d at 526; Anderson, 297 So.2d at 875; Olwell 64 Wash.2d at 833-34.
In this case, Cintolo communicated to the police— initially, through Maniscalco and her attorney, Weinstein; then directly to Sennott — only that he had the phone; that it was at his law office; and that the police could collect it if they would agree to provide a copy of the contents. Later, to Detective Banks, he added that he had taken it for safekeeping in the belief that it contained exculpatory evidence. He did not say how, when, or from whom he had received the phone.[6] He did, in other words, what the caselaw required of him.
Even if one could find fault with Cintolo’s conduct (for example, for not consulting with his client every step of the way, or even were Massachusetts to depart from the majority view concerning the defense attorney’s obligation of disclosure), there would be no grounds for suppression. For one thing, Maniscalco had non-privileged information, even before her call to Cintolo, that the defendant had given him the phone for safekeeping. The police and prosecutor knew whom to ask; she was required to and did divulge the information in the grand jury upon request; and neither Cintolo nor Weinstein could lawfully have instructed her otherwise.
Even if the information had come from Cintolo alone, moreover, it was not obtained by police misconduct. The decisions to leave the phone with Cintolo, then to disclose its whereabouts, were made by private citizens — the defendant, Cintolo, Maniscalco, and Weinstein. The police did not know the phone was in the hands of an attorney until they heard it from Weinstein and Mansicalco, and its location was not privileged in any event. There are no grounds for suppression.
ORDER
For the foregoing reasons, Defendant’s Motion to Suppress Evidence is DENIED.

Such was Maniscalco’s recollection. The grand jury minutes are not in evidence.

Cintolo testified at the hearing that he never received the copy. I credit his testimony, but also note that Cintolo has never had an appearance in this case. There was no evidence and no discussion at the hearing concerning whether the defendant’s counsel of record has received a copy of the phone’s contents. From this, I assume that he has.

Cintolo testified that he told both Sennott and Banks that the defendant had given him the phone; both Sennott and Banks testified that he did not. I credit Sennott and Banks on this.

See, in addition to cases cited in the text, In Re January 1976 Grand Jury, 534 F.2d 719 (7th Cir. 1976); Clutchette v. Rushen, 770 F.2d 1469, 1472 (9th Cir.1985), cert. denied, 475 U.S. (1986); In Re Ryder, 263 F.Sup. 360 (E.D.Va.), aff'd, 381 F.2d 713 (4th Cir. 1967); Morrell v. State, 575 P.2d 1200 (Alaska 1978); People v. Lee, 3 Cal.App.3d 514, 83 Cal.Rptr. 715 (1970); Anderson v. State, 297 So.2d 871, 875 (Fla.App.1974); State v. Carlin, 7 Kan.App.2d 219, 640 P.2d 324.327-28 (1982); State v. Green, 493 So.2d 1178, 1182 (La. 1986); Rubin v. State, 325 Md. 552, 602 A.2d 677 (1992); People v. Nash, 110 Mich.App. 428, 447, 313 N.W.2d 307, 314 (1981), aff’d in relevant part 418 Mich. 196, 341 N.W.2d 439 (1983); In re Original Grand Jury Investigation, 89 Ohio St.3d 544, 733 N.E.2d 1135 (2000); Commonwealth v. Stenhach, 356 Pa.Super. 5,16, 514 A.2d 114, 119(1986), app. denied, 517 Pa. 589, 534 A.2d 769 (1987); Restatement (Third) of the Law Governing Lawyers, §119.
*197 For qualified or contrary views, see Hitch v. Pima County Superior Court, 146 Ariz. 588, 594 708 P.2d 72 (1985) (permitting attorney to return item to client if s/he reasonably believes that evidence will not be destroyed, otherwise to the prosecution); Matter of Olson, 354 Mont. 358, 222 P.3d 632, 638 (2009); Uphoff, “The Physical Evidence Dilemma: Does ABA Standard 4-4.6 Offer Appropriate Guidance?” 62 Hastings L.J. 1177 (2011), and commentators cited.

By contrast, an attorney who acquires from a third party real evidence inculpating his client may divulge the source, because the revelation does not relate directly to the client’s possession, custody or control of the item. Morrell, 575 P.2d at 1208-09; Lee, 3 Cal.App.3d at 527.

Of course, Cintolo testified at the motion hearing that the defendant had given him the phone, but this was in response to questioning by the defendant’s trial counsel with the defendant present — a waiver, at least for purposes of the motion to suppress, of the attorney-client privilege.