Ormand N. Gale, J.
In the summer of 1973 Robert F. Garrow, Jr., stood charged in Hamilton County with the crime of murder. The defendant was assigned two attorneys, Frank H. Armani and Francis R. Beige. A defense of insanity had been interposed by counsel for Mr. Garrow. During the course of the discussions between Garrow and his two counsel, three other murders were admitted by Garrow, one being in Onondaga County. On or about September of 1973 Mr. Beige conducted his own investigation based upon what his client had told him and with the assistance of a friend the location of the body of Alicia Hauck was found in Oakwood Cemetery in Syracuse. Mr. Beige personally inspected the body and was satisfied, presumably, that this was the Alicia Hauck that his client had told him that he murdered.
This discovery was not disclosed to the authorities, but became public during the trial of Mr. Garrow in June of 1974, when to affirmatively establish the defense of insanity, these three other murders were brought before the jury by the defense in the Hamilton County trial. Public indignation reached the fever pitch, statements were made by the District Attorney of Onondaga County relative to the situation and he caused the Grand Jury of Onondaga County, then sitting, to conduct a thorough investigation. As a result of this investigation Frank Armani was no-billed by the Grand Jury but Indictment No. 75-55 was returned as against Francis R. Beige, Esq., accusing him of having violated subdivision 1 of section 4200 of the Public Health Law, which, in essence, requires that a decent burial be accorded the dead, and section 4143 of the Public Health Law, which, in essence, requires anyone knowing of the death of a person without medical attendance, to report the same to the proper authorities. Defense counsel moves for a dismissal of the indictment on the grounds that a confidential, privileged communication existed between him and Mr. Garrow, which should excuse the attorney from making full disclosure to the authorities.
The National Association of Criminal Defense Lawyers, as amicus curiae (Times Pub. Co. v Williams, 222 So 2d 470, 475 [Fla]), succintly state the issue in the following language: If this indictment stands, "The attorney-client privilege will be effectively destroyed. No defendant will be able to freely discuss the facts of his case with his attorney. No attorney will be able to listen to those facts without being faced with *188 the Hobson’s choice of violating the law or violating his professional code of Ethics.”
Initially in England the practice of law was not recognized as a profession,[1] and certainly some people are skeptics today. However, the practice of learned and capable men appearing before the court on behalf of a friend or an acquaintance became more and more demanding. Consequently, the King granted a privilege to certain of these men to engage in such practice. There had to be rules governing their duties. These came to be known as "Canons”. The King has, in this country, been substituted by a democracy, but the "Canons” are with us today, having been honed and refined over the years to meet the changes of time. Most are constantly being studied and revamped by the American Bar Association and by the bar associations of the various States. While they are, for the most part, general by definition, they can be brought to bear in a particular situation. Among those is the following, cited in United States v Funk (84 F Supp 967, 968): "Confidential communications between an attorney and his client are privileged from disclosure * * * as a rule of necessity in the administration of justice.”[2]
In the most recent issue of the New York State Bar Journal (June, 1975) there is an article by Jack B. Weinstein, entitled "Educating Ethical Lawyers”. In a subcaption to this article is the following language which is pertinent: "The most difficult ethical dilemmas result from the frequent conflicts between the obligation to one’s client and those to the legal system and to society. It is in this area that legal education has its greatest responsibility, and can have its greatest effects.” In the course of his article Mr. Weinstein states that there are three major types of pressure facing a practicing lawyer. He uses the following language to describe these: "First, there are those that originate in the attorney’s search for his own well-being. Second, pressures arise from the attorney’s obligation to his client. Third, the lawyer has certain obligations to the courts, the legal system, and society in general.”
Our system of criminal justice is an adversary system and the interests of the State are not absolute, or even paramount. "The dignity of the individual is respected to the point that even when the citizen is known by the state to have commit *189 ted a heinous offense, the individual is nevertheless accorded such rights as counsel, trial by jury, due process, and the privilege against self incrimination.”[3]
A trial is in part a search for truth, but it is only partly a search for truth. The mantle of innocence is flung over the defendant to such an extent that he is safeguarded by rules of evidence which frequently keep out absolute truth, much to the chagrin of juries. Nevertheless, this has been a part of our system since our laws were taken from the laws of England and over these many years has been found to best protect a balance between the rights of the individual and the rights of society.
The concept of the right to counsel has again been with us for a long time, but since the decision of Gideon v Wainwright (372 US 335), it has been extended more and more so that at the present time a defendant is entitled to have counsel at a parole hearing or a probation violation hearing.
The effectiveness of counsel is only as great as the confidentiality of its client-attorney relationship. If the lawyer cannot get all the facts about the case, he can only give his client half of a defense. This, of necessity, involves the client telling his attorney everything remotely connected with the crime.
Apparently, in the instant case, after analyzing all the evidence, and after hearing of the bizarre episodes in the life of their client, they decided that the only possibility of salvation was in a defense of insanity. For the client to disclose not only everything about this particular crime but also everything about other crimes which might have a bearing upon his defense, requires the strictest confidence in, and on the part of, the attorney.
When the facts of the other homicides became public, as a result of the defendant’s testimony to substantiate his claim of insanity, "Members of the public were shocked at the apparent callousness of these lawyers, whose conduct was seen as typifying the unhealthy lack of concern of most lawyers with the public interest and with simple decency.”[4] A hue and cry went up from the press and other news media suggesting that the attorneys should be found guilty of such crimes as obstruction of justice or becoming an accomplice after the fact. From a layman’s standpoint, this certainly was a logical conclusion. *190 However, the Constitution of the United States of America attempts to preserve the dignity of the individual and to do that guarantees him the services of an attorney who will bring to the Bar and to the Bench every conceivable protection from the inroads of the State against such rights as are vested in the Constitution for one accused of crime. Among those substantial constitutional rights is that a defendant does not have to incriminate himself. His attorneys were bound to uphold that concept and maintain what has been called a sacred trust of confidentiality.
The following language from the brief of the amicus curiae further points up the statements just made: "The client’s Fifth Amendment rights cannot be violated by his attorney. There is no viable distinction between the personal papers and criminal evidence in the hands or mind of the client. Because the discovery of the body of Alicia Hauck would have presented 'a significant link in a chain of evidence tending to establish his guilt’ [Leary v United States, 395 US 6 (1969)], Garrow was constitutionally exempt from any statutory requirement to disclose the location of the body. And Attorney Beige, as Garrow’s attorney, was not only equally exempt, but under a positive stricture precluding such disclosure. Garrow, although constitutionally privileged against a requirement of compulsory disclosure, was free to make such a revelation if he chose to do so. Attorney Beige was affirmatively required to withhold disclosure. The criminal defendant’s self-incrimination rights become completely nugatory if compulsory disclosure can be exacted through his attorney.”
In the recent and landmark case of United States v Nixon (418 US 683, 713) the court stated: "the constitutional need for production of relevant evidence in a criminal proceeding is specific and neutral to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts a crimitial prosecution may be totally frustrated.” In the case at bar we must weigh the importance of the general privilege of confidentiality in the performance of the defendant’s duties as an .attorney, against the inroads of such a privilege on the fair administration of criminal justice as well as the heart tearing that went on in the victim’s family by reason of their uncertainty as to the whereabouts of Alicia Hauck. In this type situation the court must balance the rights of the individual against the rights of society as a whole. There is no question but Attorney Beige’s failure to *191 bring to the attention of the authorities the whereabouts of Alicia Hauck when he first verified it, prevented bringing Garrow to the immediate bar of justice for this particular murder. This was in a sense, obstruction of justice. This duty, I am sure, loomed large in the mind of Attorney Beige. However, against this was the Fifth Amendment right of his client, Garrow, not to incriminate himself. If the Grand Jury had returned an indictment charging Mr. Beige with obstruction of justice under a proper statute, the work of this court . would have been much more difficult than it is.
There must always be a conflict between the obstruction of the administration of criminal justice and the preservation of the right against self incrimination which permeates the mind of the attorney as the alter ego of his client. But that is not the situation before this court. We have the Fifth Amendment right, derived from the Constitution, on the one hand, as against the trivia of a pseudo-criminal statute on the other, which has seldom been brought into play. Clearly the latter is completely out of focus when placed alongside the client-attorney privilege. An examination of the Grand Jury testimony sheds little light on their reasoning. The testimony of Mr. Armani added nothing new to the facts as already presented to the Grand Jury. He and Mr. Beige were cocounsel. Both were answerable to the Canons of professional ethics. The Grand Jury chose to indict one and not the other. It appears as if that body were grasping at straws.
It is the decision of this court that Francis R. Beige conducted himself as an officer of the court with all the zeal at his command to protect the constitutional rights of his client. Both on the grounds of a privileged communication and in the interests of justice the indictment is dismissed.

. St Johns L Rev, pp 283, 285.

. Garrow, Criminal L J (Dec, 1974).

. Freedman, Criminal Law Bulletin (Dec, 1974).

. Freedman, Criminal Law Bulletin (Dec, 1974).