514 A.2d 114

**COMMONWEALTH of Pennsylvania**

v.

**Walter STENHACH, Appellant (Two Cases).**

Superior Court of Pennsylvania.

Argued Oct. 29, 1985.

Filed July 31, 1986.

Joseph A. Katarincic, Pittsburgh, for appellant.

William A. Hebe, Wellsboro, for appellee.

Andrew F. Schneider, Langhorne, amicus curiae.

Before WIEAND, DEL SOLE and HESTER, JJ.

HESTER, Judge:

Two criminal defense attorneys have appealed from convictions for hindering prosecution and tampering with evidence arising from their conduct while representing a defendant in a murder trial. Appellants George and Walter Stenhach were young public defenders appointed to represent Richard Buchanan, a man charged with first degree murder. Following Buchanan's directions, appellants recovered a rifle stock used in the homicide. Allegedly believing that disclosure of the rifle stock would be legally and ethically prohibited, appellants did not deliver it to the prosecutor until ordered to do so by the court during the prosecution's case. After Buchanan's conviction of third degree murder, appellants were charged with hindering prosecution, 18 Pa.C.S. § 5105(a)(3), tampering with physical evidence, § 4910(1), criminal conspiracy, § 903, and criminal solicitation, § 902. A jury found both appellants guilty of hindering prosecution, a third degree felony, and tampering, a second degree misdemeanor. In addition, George was convicted of solicitation, and Walter of conspiracy. Each was sentenced to twelve months probation and a fine of $750.

Their appeal raises questions relating to the interplay of the fifth and sixth amendments to the United States Constitution, the statutory attorney-client privilege, and the Pennsylvania Code of Professional Responsibility, in which appellants challenge their duty to deliver evidence to the prosecution. Appellants also raise a due process challenge to the criminal statutes which prohibit hindering prosecution and tampering with evidence when these statutes are applied to criminal defense attorneys, claiming the statutes are unconstitutionally overbroad; the statutory defense of

justification; and allegations of numerous trial errors in evidentiary and other rulings. Amicus curiae briefs by the Pennsylvania Trial Lawyers Association, the National Association of Criminal Defense Lawyers and the Public Defender Association of Pennsylvania all support reversal of the judgments of sentence.

We reject appellants' argument that their retention of physical evidence was proper under existing law. We hold, however, that the statutes under which they were convicted are unconstitutionally overbroad as applied to criminal defense attorneys. Accordingly, we do not address appellants' claims of trial error, but order appellants discharged.

*Background*

In March, 1982, Theodore Young was killed in Potter County. The following day Richard Buchanan and an accomplice were arrested and charged with first degree murder. Appellant George Stenhach, part-time Public Defender of Potter County, undertook Buchanan's defense immediately. He petitioned for appointment of an investigator to assist in Buchanan's defense, and former police officer Daniel Weidner was appointed as Buchanan's investigator. During a confidential conference among Stenhach, Weidner and Buchanan, Buchanan described the death of Theodore Young. He said that Young had attacked him with two knives and that during the attack, Young had died after he was shot, hit by Buchanan's car, then struck by Buchanan's rifle, causing the stock of the rifle to break off. Buchanan and his accomplice had then disposed of the weapons and other items relating to Young's death. During the conference, Weidner and Buchanan prepared a map identifying the location of some of these items.

Appellant Walter Stenhach, George's younger brother, was practicing law in partnership with George, and assisted in Buchanan's defense. Appellants George and Walter Stenhach had graduated from law school in 1978 and 1980, respectively, and had been admitted to practice in Pennsylvania in 1979 and 1981. They discussed the information received from Buchanan, and decided to pursue the theory

of self-defense and to attempt to gather evidence supporting that theory. Accordingly, they ordered Weidner to search for the items Buchanan had described, and to retrieve as many as he could find.

On the same day, Weidner found the broken rifle stock and brought it back to appellants' office. He did not find the barrel, which was eventually discovered by the prosecutor and introduced into evidence at Buchanan's trial. Weidner was unable to locate the knives allegedly used by the victim, and no knives were ever found. When Weidner delivered the rifle stock to appellants, they stored it inside a paper bag in a desk drawer in their office.

Weidner had been a police officer for twenty years and was performing his first defense investigation in the Buchanan case. He expressed his concern as many as twenty times during the five months before Buchanan's trial that appellants were violating the law by withholding the rifle stock. Based on their research of case law, the Constitution, Pennsylvania statutes and the Pennsylvania Code of Professional Responsibility, appellants repeatedly told Weidner that the weapon was protected by the attorney-client privilege and that Weidner and appellants had a legal duty to preserve Buchanan's confidential communications which led to discovery of the weapon.

On the fourth day of Buchanan's murder trial, during an in-camera hearing, the prosecutor questioned Weidner about the rifle stock. Appellants objected on the ground that an answer would violate the attorney-client privilege. The trial judge overruled the objection, holding the privilege inapplicable to physical evidence, and ordered Weidner to answer. After Weidner testified how he had located and retrieved the rifle stock, the judge ordered its production, and appellants brought it from their office. The stock was not entered into evidence during Buchanan's trial by the prosecution or by the defense.

After Buchanan's conviction, the prosecutor, District Attorney Leber, charged appellants with hindering prosecution and tampering with evidence for withholding the rifle

stock. Due to Leber's role as a prospective witness against appellants, a prosecutor was appointed by the state attorney general's office.

At appellants' trial, the primary witnesses for the Commonwealth were Buchanan, Leber and Weidner. Due to Buchanan's invocation of his fifth amendment privilege while his conviction was on direct appeal, the trial court allowed the transcript of Buchanan's testimony in his murder trial to be read into evidence against appellants to establish the evidentiary nature of the rifle stock in question. Leber testified concerning its concealment, its production, and the effect on the prosecution of Buchanan. Weidner testified about discovery and seizure of the evidence as well as appellants' acts and statements regarding continuing retention of the weapon after its discovery.

Appellants in turn testified about the various authorities which allegedly justified their belief that they were obligated to retain the rifle stock to protect their client. They attempted to offer the expert testimony of law professor John Burkoff to establish a justification defense based on the ethical standards applicable to attorney conduct. The trial judge did not permit Burkoff to testify, nor did he instruct the jury on the defense of justification.

Following conviction and sentencing, this appeal was filed. Appellants argue four issues. First, they challenge the trial court's interpretation of the statutes as requiring production of the physical evidence without a court order. Second, they argue they were denied due process of law in that the hindering prosecution and evidence tampering statutes are unconstitutionally vague or overbroad as applied to defense attorneys when literal compliance would require them to violate their statutory, ethical and constitutional duties to their clients. Third, they claim the trial court erred in refusing to permit presentation of a justification defense. Fourth, they argue that the trial court committed reversible error by: (a) preventing defense counsel from fully cross-examining key prosecution witnesses; (b) giving the jury erroneous instructions; (c) exhibiting to the jury a

predisposition against appellants; (d) allowing the jury to consider irrelevant inflammatory evidence; (e) allowing the prosecutor to make emotional appeals to the jury based on inflammatory hypotheticals not related to the facts in evidence; and (f) ignoring the weight of the evidence establishing innocence.

The briefs of amicus curiae concentrate on the first two issues. We will address any independent points raised by amicus curiae where they relate to appellants' arguments.

In reviewing the first two arguments, we have considered various public policies and concerns which underlie the rules of law at conflict in this case. We recognize the wider implications of this appeal, the circumstances which have motivated amicus curiae to address the court. Appellants' convictions carry penalties much greater than the criminal sentences: attorneys convicted of felonies are routinely prohibited from practicing law. In addition, the criminal defense bar appears to be confused by contradictory standards pertaining to their practice and by the lack of judicial guidance in this area. Accordingly, we shall first identify the policies implicated by the facts of this case.

*Policies*

Appellants, the Commonwealth and amicus curiae all remind us of public policies and fundamental rights we should consider. Although our decision is made within the context of these policies, we summarize them briefly because they do not directly determine our decision.

Appellants urge us to give deepest consideration to the constitutional fifth and sixth amendment rights of criminal defendants, their clients. Citizens facing criminal charges must be able to obtain legal counsel free of the fear that their confidential communications will be used as evidence against them. The right not to "be compelled in any criminal case to be a witness against himself" would be empty if defense counsel, repeating information provided by a client, acted as a witness against him. The Pennsylvania Constitution, Article I, § 9, states the accused's right against self-incrimination even more broadly than the feder-

al Bill of Rights, stating that "he cannot be compelled to *give evidence* against himself."

■ The sixth amendment provides the right to assistance of counsel. This means *effective* assistance of counsel, implicating a host of constitutional rights. An accused is entitled to representation by a learned professional who knows what is meant by "due process of law," who will protect his client's rights against unreasonable searches and seizures, self-incrimination and double jeopardy and who will enforce his client's rights to the equal protection of the laws, to a speedy trial by an impartial jury and to confront witnesses against him. More specifically, effective assistance of counsel includes the requirement that counsel investigate the client's claims and use the results of investigation in defense of the accused. *Commonwealth v. Mabie*, 467 Pa. 464, 359 A.2d 369 (1976); *Commonwealth v. Manhart*, 349 Pa.Super. 552, 503 A.2d 986 (1986).

■ Closely related are the rights underlying portions of the Pennsylvania Code of Professional Responsibility. An accused is entitled to an attorney who will represent him "zealously within the bounds of the law" and who will "preserve the confidences and secrets of a client." Canons 7 and 4 of the Code. These ethical obligations of the lawyer clearly relate to the constitutional rights mentioned above, yet are not themselves to be considered as substantive law in the context of criminal proceedings, serving instead as a regulatory guide and basis for disciplinary action within the legal profession. *Estate of Pedrick*, 505 Pa. 530, 482 A.2d 215 (1984). The attorney-client privilege is codified at 42 Pa.C.S. § 5916. It provides that defense counsel "shall not be competent or permitted to testify to confidential communications made to him by his client."

Most nebulous of the policies is our concern for "the administration of justice." *Commonwealth v. Maguigan*, 323 Pa.Super. 317, 470 A.2d 611 (1983). Although the attorney-client privilege and constitutional rights such as the right against self-incrimination are "sometimes charac-

14

terized as protecting someone who has violated the law, ... this reveals a fundamental misconception. The privilege is to protect, not the guilty, but the administration of justice. '[T]he theory ... is that the detriment to justice from a power to shut off inquiry to pertinent facts in court, will be outweighed by the benefits to justice (not to the client) from a franker disclosure in the lawyer's office.' " *Id.*, 323 Pa.Superior Ct. at 329, 470 A.2d at 616, *quoting* McCormick on Evidence 175 (2d ed.1972). The Pennsylvania Supreme Court has thus stated that "the damage to the administration of justice occurs when the sanctity of the confidence is improvidently violated, not when the evidence is given substantive consideration." *Estate of Kofsky*, 487 Pa. 473, 482, 409 A.2d 1358, 1362 (1980).

Opposing the rights and policies identified above are those advanced by appellee, such as the right of the state and its citizens to the orderly administration of justice through enforcement of the criminal laws. If our system of justice requires frank disclosure between criminal defendants and their counsel, it must also require that lawyers act ethically, within the bounds of the law, so they may be perceived as officers of the court who are committed to proper administration of justice, not as subverters of justice. To exempt attorneys from the statutory proscriptions against tampering with evidence will not enhance public perception of lawyers as a positive force in the administration of justice, but will cast them in the public mind more as accessories to crime.

Another policy advanced by appellee is the truth-seeking function of the courts. Despite our societal and constitutional commitment to individual rights, it cannot be denied that protection of those rights may interfere with revelation of truth during a criminal trial. Clearly, seeking and revealing truth is an ideal of our criminal justice system. We recognize, however, the wisdom of Justice Black, dissenting in *Williams v. Florida*, 399 U.S. 78, 113–14, 90 S.Ct. 1893, 1912, 26 L.Ed.2d 446, 484 (1970):

A criminal trial is in part a search for truth. But it is also a system designed to protect "freedom" by insuring that no one is criminally punished unless the State has first succeeded in the admittedly difficult task of convincing a jury that the defendant is guilty. That task is made more difficult by the Bill of Rights, and the Fifth Amendment may be one of the most difficult of the barriers to surmount. The Framers decided that the benefits to be derived from the kind of trial required by the Bill of Rights were well worth any loss in "efficiency" that resulted.

It is important to identify the rights and policies underlying this appeal, but they are so general they do not lend themselves readily to resolution of the narrow issues we must decide. Furthermore, it is obvious that there are significant policies supporting each side of this appeal, policies seemingly at war with each other. We do not believe it is helpful to explain our decision in terms of balancing policies, as if Buchanan's fifth amendment rights were more weighty than the truth-seeking function of the judicial system. Such explications are a form of begging the question. Finally, these broad considerations focus far too much attention on the Buchanan case. We are not reviewing Buchanan's conviction, nor his right to effective assistance of counsel; we are reviewing appellants' convictions.

What is relevant to this case is the protection of constitutional rights inuring directly to appellants. We believe the primary question is whether appellants have been denied due process of law by application of a penal statute which is vague or overbroad. In this country we do not tolerate criminal statutes like those of the emperor Caligula, who wrote his laws in very fine print and displayed them high on tall pillars, "the more effectually to ensnare the people." 1 W. Blackstone, Commentaries 46. We insist that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates

the first essential of due process...." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). Within this context, we proceed to address appellants' arguments.

*Duty to Deliver*

■ Appellants' first argument is that they had no duty to turn over the rifle stock to the prosecutor until ordered to do so by the court. We reject this argument. Although we have no Pennsylvania cases on point, the decisions in other jurisdictions appear to be virtually unanimous in requiring a criminal defense attorney to deliver physical evidence in his possession to the prosecution without court order. It is true that most of the cases arose in the context of appeals from criminal convictions challenging the effectiveness of counsel who had turned over physical evidence, or in the context of litigation of discovery orders or in the context of contempt proceedings against attorneys who failed to produce evidence. The sole case in which an attorney was charged with a criminal offense resulted in the only holding that the concealed evidence was protected by the attorney-client privilege. We join the overwhelming majority of states which hold that physical evidence of crime in the possession of a criminal defense attorney is not subject to a privilege but must be delivered to the prosecution.

*In re Gartley,* 341 Pa.Super. 350, 491 A.2d 851 (1985), while not directly on point, provides guidance and support for our decision. Although the case was decided after the commission of the offenses charged against appellants herein, this court affirmed the proper execution of a carefully-tailored search warrant to seize a client's business records from an attorney's office. We stated that the use of an attorney's office

as a haven for evidence material to an ongoing criminal investigation does not place it beyond the reach of a proper search pursuant to a warrant issued on probable cause; we will not restrain the Commonwealth's efforts to obtain otherwise seizable evidence *merely* because it

has been placed in the hands of an attorney. To hold otherwise would mean that a criminal suspect could shield evidence from discovery by the simple expedient of delivery to an attorney, a result we deem patently unreasonable.

*Id.*, 341 Pa.Superior Ct. at 367, 491 A.2d at 860 (emphasis in original). Though the case did not involve the question of whether the attorney had a duty to deliver physical evidence sua sponte, we believe the quoted language provides strong support for our holding in this case.

Turning to the law in other jurisdictions, we note the much-quoted case of *State v. Olwell,* 64 Wash.2d 828, 394 P.2d 681 (1964). A criminal defense attorney had been held in contempt of court following his refusal to answer questions or produce weapons at a coroner's inquest, in defiance of a subpoena duces tecum. The appellate court reversed the finding of contempt, holding that the subpoena was defective on its face for invading the confidential relationship between attorney and client so that refusal to testify against the client was not contemptuous. *Id.* at 833, 394 P.2d 681. The court went on to state that the attorney was required to produce the weapon on his own motion, and that the jury was not to learn the source of the evidence.

We do not, however, by so holding, mean to imply that evidence can be permanently withheld by the attorney under the claim of the attorney-client privilege. Here, we must consider the balancing process between the attorney-client privilege and the public interest in criminal investigation. We are in agreement that the attorney-client privilege is applicable to the knife held by appellant, but do not agree that the privilege warrants the attorney, as an officer of the court, from withholding it after being properly requested to produce the same. The attorney should not be a depository for criminal evidence (such as a knife, other weapons, stolen property, etc.), which in itself has little, if any, material value for the purposes of aiding counsel in the preparation of the defense of his client's case. Such evidence given the attorney during

legal consultation for information purposes and used by the attorney in preparing the defense of his client's case whether or not the case ever goes to trial, could clearly be withheld for a reasonable period of time. It follows that the attorney, after a reasonable period, should, as an officer of the court, on his own motion turn the same over to the prosecution.

We think the attorney-client privilege should and can be preserved even though the attorney surrenders the evidence he has in his possession. The prosecution, upon receipt of such evidence from an attorney, where charge against the attorney's client is contemplated (presently or in the future), should be well aware of the existence of the attorney-client privilege. Therefore, the state when attempting to introduce such evidence at the trial, should take extreme precautions to make certain that the source of the evidence is not disclosed in the presence of the jury and prejudicial error is not committed. By thus allowing the prosecution to recover such evidence, the public interest is served, and by refusing the prosecution an opportunity to disclose the source of the evidence, the client's privilege is preserved and a balance is reached between these conflicting interests.

*Id.* at 833–34, 394 P.2d 681. We have quoted at length from *Olwell* because most of the cases which follow cite or quote it and raise the same issues addressed in the above passage.

*People v. Meredith,* 29 Cal.3d 682, 175 Cal.Rptr. 612, 631 P.2d 46 (1981), reached similar conclusions. A murder defendant told his attorney where he had abandoned physical evidence of the crime. The attorney's investigator retrieved the evidence, the attorney examined it and then turned it over to the police, and the evidence was admitted at trial along with testimony of the investigator describing the location of the evidence. On appeal from his conviction, the defendant conceded the admissibility of the physical evidence, but challenged the admissibility of the testimony regarding its location. The court held that the testimony did not violate the attorney-client privilege. "When defense

counsel alters or removes physical evidence, he necessarily deprives the prosecution of the opportunity to observe that evidence in its original condition or location.... To extend the attorney-client privilege to a case in which the defense removed evidence might encourage defense counsel to race the police to seize critical evidence." *Id.* 175 Cal.Rptr. at 612, 631 P.2d at 46.

In *People v. Lee*, 83 Cal.Rptr. 715, 3 Cal.App.3d 514 (1970), the court also concluded that physical evidence in the possession of an attorney was not privileged. The defendant's wife had given incriminating evidence to his attorney, and the attorney in turn gave it to a third party to hold pending judicial resolution of the proper disposition of the evidence, giving the prosecutor notice of his action. The prosecutor obtained a search warrant from the trial court, seized the evidence and introduced it at trial, together with testimony identifying the defendant's wife as the source. On appeal from his conviction for attempted murder, the court stated that

> the controlling question is whether the State's seizure of the evidence violated defendant's rights. It did not. [Counsel did not have] the right to withhold the evidence from the State by asserting an attorney-client privilege. It has been held "an abuse of a lawyer's professional responsibility knowingly to take possession of and secrete the instrumentalities of a crime." (*In re Ryder*, 381 F.2d 713, 714 [4th Cir.1967].) A defendant in a criminal case may not permanently sequester physical evidence such as a weapon or other article used in the perpetration of a crime by delivering it to his attorney....
>
> Although, as the Court held in *State v. Olwell, supra*, the fact that the client delivered such evidence to his attorney may be privileged, the physical object itself does not become privileged merely by reason of its transmission to the attorney.

*Id.* at 722, 3 Cal.App.3d at 526. The court also approved the testimony regarding the source, for the attorney-client privilege does not protect information coming to the attorney

from a third person unless such person is the client's agent. *Id.* at 723, 3 Cal.App.3d at 527.

These California decisions were followed by the Court of Appeals for the Ninth Circuit on federal habeas corpus review in *Clutchette v. Rushen,* 770 F.2d 1469 (9th Cir. 1985). The defendant told his attorney where certain evidence was located and the attorney told his investigator to retrieve it; the investigator did so, but gave it directly to the police. The evidence was introduced at trial along with the investigator's description of its location. The court held that neither the sixth amendment right to effective assistance of counsel nor the attorney-client privilege had been violated. The trial court had "scrupulously" prevented the prosecution from disclosing the source of information leading to discovery of the evidence; the source was privileged but the evidence itself lost its privileged character when the attorney ordered it removed from its original location. The court stated that "California law requires that a defense attorney must, after a reasonable time, turn evidence taken from its original resting place over to the prosecution," citing *People v. Meredith, supra.*

The issue in *Anderson v. State,* 297 So.2d 871 (Fla.App. 1974), was whether an attorney could be required to testify during his client's trial as to the source of stolen property he delivered to the police after receiving it from his client who had been charged with receiving stolen property. The court stated that to require the attorney "to testify under these circumstances would be to do violence to the fundamental concept of the attorney-client privilege.... Therefore, we hold that [the attorney cannot] be required to divulge the source of the stolen items, and in order for the privilege to be meaningfully preserved, the state cannot introduce evidence that they received the items from [the attorney's] office." *Id.* at 875.

*Morrell v. State,* 575 P.2d 1200 (Alaska Supreme Ct. 1978), is another direct appeal from a criminal conviction raising the issue of ineffectiveness of trial counsel following his delivery of incriminating physical evidence to the

police. A third party had discovered the evidence and brought it to the attorney. Unsure of his duties, he sought guidance from the ethics committee of the state bar association. The committee advised him to return the evidence to the finder, explaining the laws pertaining to concealment of evidence. Counsel did so, and assisted the third party in delivering the evidence to the police. The court held that counsel was not ineffective, stating:

> As [appellant] notes, authority in this area is surprisingly sparse. The existing authority seems to indicate, however, that a criminal defense attorney has an obligation to turn over to the prosecution physical evidence which comes into his possession, especially where the evidence comes into the attorney's possession through acts of a third party who is neither a client of the attorney nor an agent of a client. After turning over such evidence, an attorney may have either a right or a duty to remain silent as to the circumstances under which he obtained such evidence....

*Id.* at 1207. After reviewing cases involving duties of attorneys in possession of incriminating physical evidence, the court summarized their holdings.

> From the foregoing cases emerges the rule that a criminal defense attorney must turn over to the prosecution real evidence that the attorney obtains from his client. Further, if the evidence is obtained from a non-client third party who is not acting for the client, then the privilege to refuse to testify concerning the manner in which the evidence was obtained is inapplicable.

*Id.* at 1210.

Another case in which defense counsel, who had received physical evidence incriminating his client from a third party, sought the advice of the state bar association ethics committee is *Hitch v. Pima County Superior Court*, 146 Ariz. 588, 708 P.2d 72 (Supreme Ct.1985). The committee's opinion advised him he had a legal obligation to deliver the evidence to the prosecution. He informed the court of the evidence and the ethics committee opinion, whereupon the

court ordered him to turn over the evidence and to withdraw from the case. His client, prior to trial, appealed that order.

The Arizona Supreme Court, referring to "Ethical Standard to Guide [A Lawyer] Who Receives Physical Evidence Implicating His Client in Criminal Conduct," proposed by the Ethics Committee of the Criminal Justice Section of the American Bar Association, 29 Crim.L.Rptr. 2465–66 (August 26, 1981), held that the attorney might return the evidence to its source if he could do so without destroying the evidence, or he must turn it over to the prosecution. Counsel's reasonable belief that the third-party source, a friend of the client, might cause destruction or concealment of the evidence necessitated its delivery to the prosecution. The court also rejected the procedure utilized in the District of Columbia whereby such evidence is given to the local bar association for subsequent delivery to the prosecutor. The court believed that such anonymous transmittal would frequently destroy the evidentiary significance of the physical item, which often depends upon where and under what circumstances it was found. Citing *People v. Nash,* 110 Mich.App. 428, 447, 313 N.W.2d 307, 314 (1981), the court stated that "it is simpler and more direct for defendant's attorney to turn the matter over to the state as long as it is understood that the prosecutor may not mention in front of the jury the fact that the evidence came from the defendant or his attorney." *Hitch, supra,* 708 P.2d at 79. Finding no dereliction in the attorney's representation of his client, the court held that he need not withdraw unless "the client [believes] his attorney no longer has his best interest in mind." *Id.*

The only case we have found involving criminal prosecution of an attorney for failure to deliver physical evidence is *People v. Belge,* 83 Misc.2d 186, 372 N.Y.S.2d 798 (1975). Representing a murder defendant and relying on an insanity defense, counsel investigated his client's claim that he had committed other murders and discovered one of the bodies hidden in a cemetery. He left the body *in situ* and

did not reveal his discovery until his client's trial. After the murder trial, counsel was indicted for the offenses of failure to assure that a decent burial be accorded the dead and failure to report to authorities the death of a person without medical attendance. Not surprisingly,

> Public indignation reached the fever pitch.... A hue and cry went up from the press and other news media.... However, the [Constitution] attempts to preserve the dignity of the individual and to do that guarantees him the services of an attorney who will bring to the bar and to the bench every conceivable protection from the inroads of the state against such rights as are vested in the [C]onstitution for one accused of crime. Among those substantial constitutional rights is that a defendant does not have to incriminate himself. His attorneys were bound to uphold that concept and [to] maintain what has been called a sacred trust of confidentiality.

372 N.Y.S.2d at 801–02. The court held that counsel had "conducted himself as an officer of this Court with all the zeal at his command to protect the constitutional rights of his client," *id.* at 803, and dismissed the indictment.

The court did state, however, that the attorney's conduct in balancing his client's rights against the public interest in the administration of justice was, "in a sense, obstruction of justice." The court believed the grand jury was "grasping at straws," and that if instead of charging the attorney with violation of a "pseudo-criminal statute," it had charged him with obstruction of justice under a proper statute, the court would have been faced with a much more difficult decision. *Id.*

 With the exception of *Belge, id.,* the foregoing cases provide a consistent body of law, which we adopt. To summarize, a criminal defense attorney in possession of physical evidence incriminating his client may, after a reasonable time for examination, return it to its source if he can do so without hindering the apprehension, prosecution, conviction or punishment of another and without altering, destroying or concealing it or impairing its verity or avail-

ability in any pending or imminent investigation or proceeding. Otherwise, he must deliver it to the prosecution on his own motion. In the latter event, the prosecution is entitled to use the physical evidence as well as information pertaining to its condition, location and discovery but may not disclose to a fact-finder the source of the evidence. We thus reject appellants' contention that their conduct was proper and that they had no duty to deliver the rifle stock to the prosecution until they were ordered to do so.

### Due Process: Overbreadth

■ Appellants' second argument is that the statutes against hindering prosecution and tampering with evidence are unconstitutionally vague or overbroad as applied to attorneys engaged in the representation of criminal defendants, and hence their enforcement against appellants was a denial of due process. We agree. Our discussion of appellants' first argument, while holding that defense attorneys have an affirmative duty to deliver physical evidence to the prosecution, clearly demonstrates that there are conflicting concerns facing defense attorneys in possession of incriminating physical evidence. Moreover, we are not aware of *any* case in *any* state in which an attorney was convicted of a crime for conduct similar to that of appellants. Due to the fact that the statutes in question prohibit conduct of defense attorneys which is constitutionally protected, we hold the statutes [1] unconstitutionally overbroad as applied to appellants and vacate their judgments of sentence.

■ Appellants have challenged the statutes on grounds of both vagueness and overbreadth, closely related to infirmities which often merge conceptually and in case law. Constitutionally vague statutes proscribe activity in terms so ambiguous that reasonable persons may differ as to what is actually prohibited. Examples are found in *Baggett*

---

1. We address the constitutionality of the statutes against tampering with physical evidence, 18 Pa.C.S. § 4910, and hindering prosecution, 18 Pa.C.S. § 5101, only. Appellants' convictions of solicitation, 18 Pa.C.S. § 902, and conspiracy, 18 Pa.C.S. § 903, are vacated due to their pendant relationship to the substantive statutes.

*v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), which struck down a statute prohibiting "subversive" organizations; *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), which invalidated a statute outlawing treatment of a United States flag "contemptuously"; and *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), which voided an ordinance against groups conducting themselves on sidewalks "in a manner annoying to persons passing by."

▆ Overbroad statutes authorize the punishment of constitutionally protected conduct; where the language of the statute is not vague, but literally encompasses a variety of protected activity, it cannot be read literally. In an overbroad statute, the clarity of the language is delusive, for the language must be recast to separate proper from improper applications. One example of overbreadth is found in *Coates v. Cincinnati, supra,* which, in addition to using the vague term "annoying," criminalized the exercise of the right of assembly guaranteed by the first amendment. The ordinance could be used against the association of people whose ideas, lifestyle or physical appearance is resented by their fellow citizens, and was thus "aimed directly at activity protected by the Constitution." *Id.* at 616, 91 S.Ct. at 1689, 29 L.Ed.2d at 218. Another example is *Lewis v. New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), holding overbroad a statute prohibiting "opprobrious language," for the statute could be applied against constitutionally protected speech—words that do not inflict injury or tend to incite an immediate breach of the peace.

*Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), rejecting an overbreadth challenge, sets forth a useful definition of the term.

A clear and precise enactment may nevertheless be "overbroad" if in its reach it prohibits constitutionally protected conduct. Although appellant does not claim that, as applied to him, the anti noise ordinance has punished protected expressive activity, he claims that the ordinance is overbroad on its face. Because overbroad

laws, like vague ones, deter privileged activity, our cases firmly establish appellant's standing to raise an overbreadth challenge. The crucial question, then, is whether the ordinance sweeps within its prohibitions what may not be punished....

*Id.* at 114–15, 92 S.Ct. at 2302, 33 L.Ed.2d at 231.

Both overbroad and vague statutes deny due process in two ways: they do not give fair notice to people of ordinary intelligence that their contemplated activity may be unlawful, and they do not set reasonably clear guidelines for law enforcement officials and courts, thus inviting arbitrary and discriminatory enforcement. *Smith v. Goguen, supra; Papachristou v. Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *Coates v. Cincinnati, supra.*

We hold that the statutes at issue in this case are overbroad when applied to attorneys representing criminal defendants. The literal language of each section is relatively clear. Section 5105(a)(3) states that a person is guilty of hindering prosecution "if, with intent to hinder the ... conviction ... of another for crime, he ... conceals ... evidence of the crime ... regardless of its admissibility in evidence...." Section 4910 provides that a person is guilty of tampering with physical evidence "if, believing that an official proceeding ... is pending ..., he ... conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding...." The clarity of the language is delusive, for it prohibits conduct which cannot constitutionally be prohibited along with conduct which clearly can. In certain circumstances, an attorney might conceal evidence with the intent of impairing its availability in his client's criminal trial and with the intent of hindering his client's conviction.

An example of such circumstances might involve an attorney whose client gives him a handwritten account of involvement in the crime he is charged with committing. If the attorney were to destroy the statement or retain it in

his file, he would be guilty of violating the literal terms of the statutes against hindering prosecution and tampering with evidence. Yet no one would suggest the attorney should give the document to the prosecutor; indeed, to do so would be an egregious violation of the attorney's duties to his client.

The functions of the attorney counseling a criminal defendant have a constitutional dimension. In opposing unreasonable searches and seizures, in preventing self-incrimination and in rendering effective assistance of counsel, the defense attorney is charged with the protection of fourth, fifth and sixth amendment rights. In performing these functions, the defense attorney might run afoul of the statutes against hindering prosecution and tampering with evidence; thus he may not have adequate notice of what conduct might be a crime, and he is subject to the threat of arbitrary and discriminatory prosecution.

Beyond the obvious example stated above, there is little or no guidance for an attorney to know when he has crossed the invisible line into an area of criminal behavior. There are no prior cases in this jurisdiction in which a criminal defense attorney has been convicted of violating these statutes. We have discussed many of the similar cases from other jurisdictions, none of which addresses the precise issues facing us in this case. Although we focused on the uniformity we found in those cases as to disposition of physical evidence, they express a great deal of doubt and reflect great diversity as to the grayer areas of ethical usage of evidence of all sorts. Attorneys face a distressing paucity of dispositive precedent to guide them in balancing their duty of zealous representation against their duty as officers of the court. Volumes are filled with other potential sources of guidance, such as ethical codes and comments thereto, both proposed and adopted, advisory opinions by ethics committees and myriad articles in legal periodicals. The plethora of writings exemplifies the profession's concern with the problem, and although they may

help to clarify some of the issues, they fail to answer many of the difficult questions in this area of legal practice.

In the cases discussed in the preceding section, we find many statements which belie the seeming consistency in their approach to the problem. *People v. Belge, supra,* of course, dismissing the indictment against an attorney who had withheld evidence, focused on the rights of a criminal defendant rather than the society's interest in criminal law enforcement:

> A trial is in part a search for truth, but it is only partly a search for truth. The mantle of innocence is flung over the defendant to such an extent that he is safeguarded by rules of evidence which frequently keep out absolute truth, much to the chagrin of juries. Nevertheless, this has been a part of our system since our laws were taken from the laws of England and over these many years has been found to best protect a balance between the rights of the individual and the rights of society.

*Belge, supra,* 372 N.Y.S.2d at 801. Another example is *In re Gartley, supra,* wherein this court stated:

> Not only is effective assistance of counsel a constitutional mandate, it is also necessary to an adversary system of justice. Assuredly, counsel's assistance can be made safely and readily available only when the client is free from the apprehension of disclosure.

*Gartley, supra,* 341 Pa.Superior Ct. at 365–367, 491 A.2d at 859–60. Similarly, in *Commonwealth v. Maguigan, supra,* we wrote:

> It therefore appears that, whatever its exact dimensions, the interests of justice exception is very narrow, extending to such situations as those in which "the client's rights or interests cannot be adversely affected [by disclosure]." Indeed, it is evident that this must be so. Otherwise the exception would devour the rule. For the interests of justice are *always* "frustrated" by the exercise of the privilege in the sense that the prosecutor is unable to learn from the attorney what he would like to

learn. As already discussed, however, a true understanding of the interests of justice carries with it an appreciation of the fact that free communication between the client and attorney must be fostered; and as we have said, in *Cohen* [*v. Jenkintown Cab Co.*, 238 Pa.Super. 456, 357 A.2d 689 (1976)] and again in *Brennan,* that means that any exception to the privilege must be narrowly confined, all doubts being resolved in favor of non-disclosure.

*Maguigan, supra,* 323 Pa.Superior Ct. at 339, 470 A.2d at 622. The *Maguigan* opinion referred to the decision in *Brennan v. Brennan,* 281 Pa.Super. 362, 371–72, 422 A.2d 510, 514–15 (1980), in which we stated that the attorney-client privilege

is not concerned with prejudice, the ascertainment of the truth, or the reliability of attorney-client communications, but only to foster a confidence between an advocate and his client that will lead to a trusting and open dialogue.

. . . .

Moreover, in making the determination of whether the interests of justice may be frustrated by the exercise of the privilege, the court should *resolve all doubts in favor of non-disclosure,* so that a client should not be chagrined to learn that the confidences that he conveyed to his attorney have been revealed to his detriment and without his consent.

(Emphasis in original.) Finally, *Hitch v. Pima County Superior Court, supra,* although holding that an attorney has a duty to deliver incriminating evidence to the prosecutor, added:

We note also that the lawyer's role as a zealous advocate is an important one, not only for the client but for the administration of justice. We have chosen an adversary system of justice in which, in theory, the state and the defendant meet as equals—"strength against strength, resource against resource, argument against argument." *United States v. Bagley,* 473 U.S. 667, —— n.

2, 105 S.Ct. 3375, 3390 n. 2, 87 L.Ed.2d 481, 486 n. 2 (1985) (Marshall, J., dissenting). In order to close the gap between theory and practice and thereby ensure that the system is working properly, a defendant must have an attorney who will fight against the powerful resources of the state. It is only when this occurs that we can be assured that the system is functioning properly and only the guilty are convicted.

*Hitch, supra,* 708 P.2d at 76.

Two cases cited in the previous section involved attorneys who had sought advisory opinions from ethics committees when confronted with problems related to disposition of physical evidence. Their action was salutory, but underscores the dilemma facing criminal defense attorneys in similar situations. Not only is the resort to guidance from an ethics committee a time-consuming process,[2] it is a process totally inconsistent with the precision which must attend a valid criminal statute to inform its subjects of what specific behavior is proscribed.

Another symbol of the dilemma is its extensive treatment in legal periodicals. Of the many articles which have been cited by the parties in this case, we have found several to be helpful and noteworthy.[3] Nonetheless, the writings exem-

---

**2.** The court in *Hitch, supra,* explained the result of seeking advice in that case:

> We note that the prosecution in this matter has been delayed for over a year while this issue is being resolved. We believe that the recourse to the State Bar Ethics Committee, while proper and commendable, resulted in an excessive delay. We hope that in the future the State Bar Ethics Committee will be more prompt in responding to requests for opinions when, as here, a criminal prosecution is held in abeyance awaiting the opinion of the Committee.

*Id.* 708 P.2d at 79 n. 3.

**3.** *See* Comment, *Ethics, Law and Loyalty: The Attorney's Duty to Turn Over Incriminating Physical Evidence,* 32 Stan.L.Rev. 977 (1980); Comment, *The Right of a Criminal Defense Attorney to Withhold Physical Evidence Received from His Client,* 38 U.Chi.L.Rev. 211 (1970); Comment, *Disclosure of Incriminating Physical Evidence; The Defense Attorney's Dilemma,* 52 U.Colo.L.Rev. 419 (1981).

plify a variety of approaches and suggestions, and indicate that an evidentiary problem related to incriminating evidence might arise in divers contexts in the representation of criminal defendants. It is not incumbent upon attorneys to digest the legal periodicals in order to conform their conduct to a criminal statute. The statutes involved in this case embrace conduct which is constitutionally protected as well as conduct which may validly be prohibited, and there is no line between the two which can be ascertained with any assurance whatsoever.

Even if it were possible, it is not the function of this court to provide an advisory opinion as to various examples of attorney conduct not involved in this case which might or might not violate the statutes we are reviewing. We note that other jurisdictions have enacted criminal statutes which address the unique role of defense attorneys in the administration of criminal justice and do not subject them to rules identical with those applicable to the public. *See Clark v. State,* 159 Tex.Cr.R. 187, 261 S.W.2d 339, *cert. denied,* 346 U.S. 855, 74 S.Ct. 69, 98 L.Ed. 369 (1953) (statute specifically excluded from liability one who aids an offender in preparing his defense). We note, also, as the Pennsylvania Supreme Court iterated in *Estate of Pedrick, supra,* that the courts have the power, outside the context of criminal sanctions, to regulate the conduct of attorneys practicing before them, and that the Pennsylvania Supreme Court has established a Disciplinary Board together with comprehensive rules for dealing with apparent attorney misconduct. *Id.,* 505 Pa. at 542, 482 A.2d at 221.

For these reasons, we hold that the statutes which prohibit hindering prosecution and tampering with physical evidence are unconstitutionally overbroad when applied to attorneys representing criminal defendants.

Accordingly, the judgments of sentence are vacated and appellants discharged.