J-S27033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY D. BAKER | : | |
| | : | |
| Appellant | : | No. 3107 EDA 2019 |

Appeal from the PCRA Order Entered September 27, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003700-2013

BEFORE:   SHOGAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED JULY 14, 2020**

Appellant, Anthony D. Baker, appeals from the order entered in the

Court of Common Pleas of Philadelphia County dismissing his first petition filed

pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-

9546 after conducting an evidentiary hearing.  Herein, Appellant raises three

claims of ineffective assistance of trial counsel relating to counsel's role in

permitting the improper admission of allegedly inculpatory evidence,

testimony, and argument during trial.  We affirm.

This Court has previously summarized the facts and procedural history

leading up to and including the trial phase of the present matter, as follows:

> On February 9, 2012, Baker was involved in an altercation near
> the intersection of Hansberry and Marion Streets in Philadelphia.
> N.T., 2/25/14, at 60-62.  The altercation began as an argument
> between the victim[, David McClenic,] and a group of other males,

_____

[*] Former Justice specially assigned to the Superior Court.

including Baker. *Id*. The argument quickly turned physical, and a fistfight broke out between the victim and another male, Steve Dickey, in the middle of Marion Street.[fn] *Id.* at 64. Baker and other males watched the fight and encouraged Dickey. *Id.* 65-66. The fighters then crashed through a side door into a residence where the victim's girlfriend lived. *Id.* at 64-65.

---

Fn. An unidentified third person joined in the fight and assisted the other male in assaulting the victim. N.T., 2/25/14, at 69-70.

---

After breaking the door, Dickey got up and left the residence, rejoining the other males. *Id.* at 70. The victim got up from the floor and walked back outside, following Dickey and the other males. *Id.* at 71. Once outside, the victim took off his shirt and stood in the middle of Marion Street, yelling for the men to come back and fight him individually. *Id.* at 71, 75. Several of the men, including Baker, then surrounded the victim. *Id.* at 170-71. Baker pulled out a firearm and began to shoot at the victim. N.T., 2/26/14, at 89, 118-19. The victim ran down Marion Street toward Queens Lane while Baker continued to fire at him. N.T., 2/25/14, at 74-77. When a police officer arrived at the scene, he found the victim lying unresponsive in the street between two parked cars. N.T., 2/26/14, at 25-26. Paramedics pronounced the victim dead at the scene of the shooting. N.T., 2/25/14, at 150.

On March 6, 2014, a jury found Baker guilty of first-degree murder, firearms not to be carried without a license, and possession of an instrument of crime. N.T., 3/6/14, at 11-12.

On March 6, 2014, the trial court sentenced Baker to the following concurrent terms of incarceration: Imprisonment without the possibility of parole for the first-degree murder conviction; 3½ to 7 years' incarceration for the firearms not to be carried without a license conviction; and 2½ to 5 years' incarceration for the possessing an instrument of crime conviction. On May 30, 2014, Baker filed a petition pursuant to the Post Conviction Relief Act.[] The trial court granted the petition on March 10, 2015, reinstating Baker's direct appeal rights *nunc pro tunc*. Baker filed a timely notice of appeal on March 11, 2015. Both Baker and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

*Commonwealth v. Baker*, No. 764 EDA 2015, 2016 WL 5939457, at *1 (Pa Super.Ct., filed Oct. 12, 2016).

In **Baker**, this Court affirmed judgment of sentence after finding the trial court acted within its discretion in denying Appellant's two motions for mistrial, one made after the prosecutor had shouted and requested the court to admonish Appellant's character witness, and the other after the jury had informed the court for a third time over two days of deliberations that it was deadlocked. Subsequently, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. 169 A.3d 33 (Pa. 2017) (table).

Appellant filed a timely *pro se* PCRA petition alleging several instances of ineffective assistance of trial counsel. Thereafter, he retained counsel, who filed an amended petition raising three claims of ineffectiveness, namely: (1) trial counsel ineffectively called Steven Dickey as a defense witness without first ascertaining Dickey had agreed at his own guilty plea colloquy to the Commonwealth's narrative naming Appellant as McClenic's shooter, which subjected Dickey to impeachment on cross-examination; (2) counsel ineffectively failed to file a motion *in limine* to preclude the prosecution from revealing at trial that it was the defense who notified the prosecution that a gun recovered in a subsequent neighborhood murder was also the murder weapon in this case, as this allowed the prosecution to argue such notification suggested Appellant's guilty knowledge and culpability; and (3) counsel ineffectively lodged an unsuccessful "badgering the witness" objection to the prosecutor's comment during cross-examination of Appellant that Appellant

was "out there killing people," where an objection to an impermissible bad character reference would have been the appropriate objection.

The PCRA court conducted a hearing on May 3, 2019, at which trial counsel and Appellant testified. Afterward, the court accepted post-hearing briefs from both parties. On September 27, 2019, the PCRA court denied Appellant's petition. This timely appeal followed.

Appellant raises three issues for our consideration:

1. Whether trial counsel was ineffective in facilitating the introduction of highly inculpatory evidence upon which a jury could decide that Appellant Baker was the shooter.

2. Whether trial counsel was ineffective in failing to move to bar argument that could persuade a jury that Appellant Baker was linked to the murder weapon.

3. Whether trial counsel was ineffective in failing to object to improper "bad character" evidence introduced by the Commonwealth.

Appellant's brief, at 4.

When reviewing an appeal from the denial of PCRA relief,

we must determine whether the findings of the PCRA court are supported by the record and whether the court's legal conclusions are free from error. The findings of the PCRA court and the evidence of record are viewed in a light most favorable to the prevailing party. The PCRA court's credibility determinations, when supported by the record, are binding; however, this court applies a *de novo* standard of review to the PCRA court's legal conclusions. We must keep in mind that the petitioner has the burden of persuading this Court that the PCRA court erred and that such error requires relief. Finally, this Court may affirm a valid judgment or order for any reason appearing of record.

- 4 -

*Commonwealth v. Montalvo*, 205 A.3d 274, 286 (Pa. 2019) (citations omitted).

Counsel is presumed to be effective and "the burden of demonstrating ineffectiveness rests on [the] appellant." *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010).

> To satisfy this burden, an appellant must plead and prove by a preponderance of the evidence that[ ] "(1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different." *Commonwealth v. Fulton*, 830 A.2d 567, 572 ([Pa] 2003) [(plurality)]. Failure to satisfy any prong of the test will result in rejection of the appellant's ineffective assistance of counsel claim. *Commonwealth v. Jones*, 811 A.2d 994, 1002 ([Pa.] 2002).

*Commonwealth v. Holt*, 175 A.3d 1014, 1018 (Pa. Super. 2017).

To establish prejudice, the petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. When it is clear that the appellant has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone, without a determination of whether the first two prongs have been met. *Commonwealth v. Travaglia*, 661 A.2d 352, 357 (Pa. 1995). Thus, even if counsel had no reasonable basis for the course of conduct pursued, an appellant is not entitled to relief if he fails to demonstrate the requisite prejudice which is necessary under Pennsylvania's

ineffectiveness standard. ***Commonwealth v. Douglas***, 645 A.2d 226, 232 (Pa. 1994).

In Appellant's first issue, he faults trial counsel for having "committed a fundamental error" in calling co-defendant Steven Dickey to the witness stand to corroborate Appellant's intended testimony later at trial that he and Dickey had walked away from the McClenic fight prior to the shooting. Before Appellant's trial, Dickey had pleaded guilty to charges based on his involvement with McClenic's murder. During his guilty plea colloquy, he acceded to the prosecution's identification of Appellant as McClenic's shooter.

Appellant posits it was incumbent upon trial counsel to have secured the notes of testimony to Dickey's guilty plea and review it for such an inconsistent statement to the exculpatory one he was prepared to give at Appellant's trial. Dickey would clearly be subject to cross-examination revealing that he had recently pleaded guilty and agreed to the statement that Appellant was McClenic's shooter, Appellant maintains, as it enabled the Commonwealth to impeach Dickey's alibi and inform the jury that Dickey implicated Appellant in the shooting.

Trial counsel testified at the PCRA hearing that he never met with Dickey prior to trial but, instead, based his decision to call Dickey as a witness on his investigator's interview of Dickey, in which Dickey said he would testify at trial that Appellant did not shoot McClenic. N.T. 5/3/19, at 10-12. This interview, however, preceded Dickey's guilty plea hearing. N.T. at 10-12. Trial counsel also asserted that he reviewed the guilty plea colloquy prior to calling Dickey

to the stand, although he could not remember specifically when he did so. N.T. at 11-12, 14-15. He nevertheless decided to call Dickey because Dickey remained the only eyewitness to the McClenic event who corroborated Appellant's testimony that the two men walked away from the scene prior to the shooting. N.T. at 26-29.

Appellant argued at the PCRA hearing that it would have been impossible for trial counsel to have read the notes of testimony of Dickey's guilty plea colloquy prior to trial, for they were not transcribed until midway through Appellant's trial and were not accessible unless a specific request for a copy were made. Only the District Attorney's Office and the Public Defender's Office had access to the Court Reporter System providing the transcript, and the prosecution introduced the notes of testimony for the first time at trial during its cross-examination of Dickey.

Appellant contends that no competent lawyer would have called Dickey to the stand without first reviewing the guilty plea transcript to ascertain whether and to what extent he had implicated Appellant in McClenic's murder. Particularly where the defense had exposed multiple inconsistencies in the testimonies of Commonwealth eyewitnesses to the shooting, Appellant continues, there was no reasonable defense strategy to presenting Dickey's testimony and enabling the Commonwealth to introduce his damaging guilty plea colloquy on cross-examination.

The Commonwealth responds that, even assuming trial counsel did not review Dickey's guilty plea colloquy prior to calling him to the stand, Appellant

fails to establish prejudice where several eyewitnesses who knew Appellant as a frequent presence in their immediate neighborhood unequivocally identified him as the shooter on the night of the murder, and where evidence showed Appellant had fled and gone into hiding for a year after the shooting, reflecting his consciousness of guilt. Moreover, the Commonwealth argues, although the prosecutor was able to use Dickey's colloquy to impeach the credibility of the alibi he offered for Appellant, Dickey did not add to the incriminating evidence against Appellant. Indeed, Dickey proved to be so incredible as a witness, the Commonwealth posits, and repeatedly claimed that he simply went through the motions at his colloquy of saying what was necessary to receive the negotiated sentence, that the jury likely attached little to any weight to his trial testimony.

We find that, on balance, the record fails to support Appellant's argument that but for counsel's decision to call Dickey to the witness stand there would have been a reasonable probability of a different outcome. The Commonwealth presented the testimony of four members of the Thomas family, who witnessed the fight and shooting from just several feet away and unequivocally identified Appellant as McClenic's shooter. During the approximately thirteen hours of deliberations conducted over three days, however, the jury advised the court on three separate occasions that it was

at impasse and, ultimately, "hopelessly deadlocked."[1]  The court gave the jurors a *Spencer* charge[2], dismissed them for the day, and ordered them to resume deliberations the next morning.

_____

[1] In *Baker*, *supra*, this Court noted the trial court acted appropriately in denying Appellant's motion for mistrial based on the jury's impasse and directing the jury to resume deliberations:

> Considering the severity of the charges against Baker and the volume of testimony presented, the trial court appropriately returned the jury to its deliberations despite multiple indications of deadlock.[] As in [*Commonwealth v. Cook*, 557 A.2d 421, 425 (Pa.Super. 1989)] and [*Commonwealth v. Jorden*, 482 A.2d 573, 576–78 (Pa.Super. 1984)], the trial court provided a non-coercive environment, here allowing the jury to take multiple breaks and twice sending it home early, the latter time so it could "start fresh" the next day.

*Baker*, No. 764 EDA 2015, 2016 WL 5939457, at *4.

[2]  A *Spencer* charge, guided by our Supreme Court's decision in *Commonwealth v. Spencer*, 275 A.2d 299 (Pa. 1971), instructs a deadlocked jury "to continue to deliberate, with an open mind to reconsideration of views, without giving up firmly held convictions."  Here, the trial court charged the jury as follows:

> You, ladies and gentlemen, must well appreciate the time, anxiety and expense involved in a re-trial of this matter. There are no other 12 people any more able to resolve the issues than you are, ladies and gentlemen.
>
> Please keep the following in mind: You realize, of course, that any verdict you return must [be] a unanimous verdict.
>
> That you have a duty, ladies and gentlemen, to consult with one another and to deliberate with a view to reaching a unanimous agreement if it can be done without violence to individual judgment.

On the next day, at 2:11 p.m., the foreperson asked the trial court for a reading of testimony provided by Jaleesa Thomas, McClenic's girlfriend. The court granted the request and summoned the jury to the jury box to listen to a court officer read the entire testimony of Jaleesa Thomas. The jury resumed deliberations and shortly thereafter informed the court that it had reached a verdict. With court back in session, the jury announced its guilty verdict. N.T. 3/6/14, at 4-12.

Jaleesa's testimony, on which the jury appears to have focused intently just before moving beyond impasse and reaching its guilty verdict, provided

---

That each juror must decide the case for himself or herself but only after an impartial consideration of the evidence with his and her fellow jurors.

That a juror should not hesitate to reexamine his or her own views and to change his or her opinion if convinced that it is erroneous, but no juror should surrender his or her honest convictions as to the weight or [e]ffect of the evidence simply because of the opinion o[f] his fellow jurors or for the mere purpose of returning a unanimous verdict.

I am mindful that you, ladies and gentlemen, have been at this, excluding breaks and lunch, for two working days now. However, I want you, members of the jury, to keep the foregoing in mind because this Court must send you back to the jury deliberation room to give further consideration to both the evidence and the law to see if you can arrive at a unanimous verdict.

Bear in mind that if the Court can be of any assistance to you in any way in this effort, I will be happy to oblige.

N.T., 3/5/14, at 13.

a first-hand account of the events entirely independent from and unassisted by Dickey's testimony.

Specifically, Jaleesa testified at trial that she did not know Appellant personally, but she knew him by sight because his group "hung out" on her street every day, and she had seen him "hundreds of times." N.T., 2/24/14, at 68-69. She testified that he tried to get better acquainted with her by frequently attempting in vain to strike up conversation or block the path to her front door when she was returning to her home. N.T. 2/24/14 at 140. She was familiar enough with Appellant to have referred to him as "Hart" after the actor Kevin Hart, who is similarly complexioned and short in stature, when talking about him to her sister Shavon.

Jaleesa also gave a detailed description of the actions that placed her in a position to witness Appellant fire the shots that killed her boyfriend, David McClenic. At about 2:00 a.m., Jaleesa was asleep in her home when McClenic called her and asked her to come to the front door to let him in. Three minutes later, Jaleesa made her way to the door in her pajamas and saw McClenic emerging from an alley across the narrow street running along the side of her corner home. McClenic was arguing with the group of five men until a fist fight erupted between Dickey and himself. N.T. at 65.

Jaleesa went outside in an attempt to stop the fight, but the men continued until Dickey and another man from the group overtook McClenic and crashed through the side door of the Thomas home. N.T. at 70. At this time, Jaleesa noticed Appellant "egging on" Dickey. N.T. at 70. Once in the

home, Jaleesa tried to hold McClenic back, but he exited the home, took off his shirt, and continued to challenge the men to fight. N.T. at 71, 75. Jaleesa followed him outside again in an effort to persuade him to stop, but he asked her to shut off the engine to his car, which he had parked on the side street next to her home. N.T. at 71.

As she was opening the driver's door, Jaleesa looked at the group and saw Appellant and others still there near the side door to her home where the fighters had just burst through. N.T. at 73-74, 104. She entered the car and reached for the key in the ignition when she heard the first gunfire. N.T. at 75. She looked up and saw David, who looked "startled" to her, running down the sidewalk along the side street with Appellant chasing him while firing many shots. N.T. at 76-78, 105-120. The other men immediately boarded a white car and drove away from the scene. N.T. at 79. Police arrived, and Jaleesa, along with her sister, mother, and grandmother, who had also witnessed the shooting from their porch, identified Appellant as the shooter. N.T. at 81-84.

A central point in Appellant's prejudice argument is that Jaleesa Thomas provided inconsistent testimonies over the course of several proceedings in describing the shooter's physical features. Specifically, Appellant argues that Thomas' preliminary hearing testimony described the shooter as standing 5'9", when in fact Appellant is several inches shorter than that at 5'5".

At trial, however, Jaleesa Thomas disputed that she had said 5'9" as was recorded at the preliminary hearing.[3] Moreover, the Commonwealth on redirect established that she gave a statement to investigators at the Homicide Unit on the night of the shooting that the shooter was Appellant, whom she knew to be a short black male in his 20's, standing about 5'5", with a goatee and wearing a black skully cap, black jacket and black pants that night. It was Thomas' concomitant description that night of Steven Dickey—who brawled with McClenic before the shooting—that included the height of 5'9". When presented with a photo array at the Homicide Unit, Jaleesa circled Appellant's photo and wrote "shooter," and circled Dickey's photo and wrote "fighter."

_____

[3] Specifically, Jaleesa testified on cross-examination as follows:

> **Q:** There is one part here where it [preliminary hearing notes of testimony] talks about height. Do you remember what you told the detectives what the height was?
> **A:** Five-five.
> **Q:** Under oath to a judge, were you asked the question about height?
> **A:** Yes.
> **Q:** You read this the other day with the prosecutor, correct?
> **A:** Yes.
> **Q:** Your answer there is: "About five foot, nine inches.
> **A:** That was incorrect.
> **Q:** Let me finish the question. **The answer is**: "About five foot, nine inches." Do you remember giving that answer?
> **A:** No.
> **Q:** Everything else you remember giving, but that five-foot-nine you don't remember giving?
> **A:** Correct.

N.T. 2/25/14 at 128.

Jaleesa Thomas' identification was largely corroborated by her family members. Her sister, Shavon, confirmed she also witnessed the episode from the moment when McClenic was pushed through the side door of their home to when Appellant began shooting McClenic. Like Jaleesa, Shavon also gave a statement at the Homicide Unit that the shooter was a short, black male in his early 20's, 5'5" or 5'6", with a goatee beard and dressed in all black and a hoodie like the others in the group. N.T. at 179. She, too, circled Appellant's photo and wrote "shooter" when shown a photo array.

While Shavon did not recall Jaleesa and herself giving Appellant a height-based moniker, her recollection of Appellant's presence in the neighborhood was consistent with her sister's. She, too, was familiar with Appellant, having seen him in the neighborhood "a good five or six times." N.T. at 184. She testified she knew him to be only slightly taller than she was at 5'4", and she noted he was clearly the shortest member of the group that night. N.T. at 179, 207-08. From her porch, she had a view of Appellant's profile as he pulled out what she said was a six-inch gun and fire shots at McClenic. N.T. at 199-202.

Jaleesa's mother, Tamika Thomas Barnes, and her grandmother, Jenette Gorham, also testified to their observations of the fight and shooting from their respective vantage points inside the house and on the front porch. Specifically, Ms. Barnes testified that she would see Appellant hanging around "a lot" at or near her corner property over the previous two years. She described him as short, around 5'4" or 5'5".

On the night in question, she witnessed Appellant standing near the front window of her home cheering on Dickey during the fist fight between McClenic and Dickey. Ms. Barnes, however, had gone upstairs to call police and change out of her robe when the shooting occurred. Her mother, Ms. Gorham, also testified to knowing Appellant to see him in the neighborhood, given his distinctive short stature compared to the others. She claimed to see him frequently near her family's home over the previous two years. N.T. 2/26/14, at 94-95. She did not go with her daughter and granddaughters to the Homicide Unit to make an identification because of the early morning hour, but she made an in-court identification of Appellant as the shooter. N.T. at 93.

Notably, all four eyewitnesses placed Appellant at the scene of the fight as it was unfolding, and the three who continued to witness events over the last minutes leading up to and including the gunfire unequivocally identified Appellant as the shooter. While Appellant seizes upon inconsistencies among the witnesses "on the identification issue," these had little to no effect on the reliability of the identifications themselves as they involved relatively secondary matters.

For example, Appellant points to the conflict between Jaleesa's and Shavon's testimonies regarding Jaleesa's location at the time of the shooting. Jaleesa testified she was in McClenic's car alongside the house, while Shavon testified she was on the front porch with Jaleesa and her grandmother when

at the time gunfire erupted.[4]  Jaleesa, however, claimed no advantage from her position inside the car, as she volunteered that she did not see the initial shot because she was reaching for the key, but was able to see Appellant chase McClenic up the sidewalk while firing additional shots.  There was no dispute, furthermore, that either vantage point provided a clear sightline to the shooting.

Other inconsistencies raised by Appellant involved Shavon answering "no" on cross-examination when asked if she and her sister shared a height-based nickname for Appellant, and the sisters giving conflicting one-word answers about whether they discussed the shooting while being taken to the Homicide Unit.  It would have been reasonable for the jury to disregard the lack of consensus between the sisters' testimonies regarding use of a nickname for Appellant when considering their otherwise consistent identifications, and where each sister otherwise testified she knew Appellant not as a friend but from his frequent presence in the neighborhood and from his distinctive short stature compared to the other men in the group.  Similarly, the jury heard the four eyewitnesses from the Thomas family describe in detail the events of a fight and fatal shooting that occurred just a few feet from where they stood outside their home.  A passing question as to whether they may or may not have discussed the matter while being taken to

---

[4] Mother, Tamika Thomas Barnes, testified that Jaleesa had left the porch and gone onto the street to try and convince McClenic to come back inside, which supports Jaleesa's account of her whereabouts just before the shooting.

the Homicide Unit was not developed any further at trial in any meaningful way so as to have created doubt about their observations shared with investigators at the scene, their statements and identifications made at the Homicide Unit, or their testimonies offered at trial.

Given this record of the Thomas family's consistent and unwaivering identifications, made from a vantage point just feet away from the shooting, we cannot agree with Appellant's assertion that the defense "had impeached the Commonwealth's eyewitnesses" to such a degree that the introduction of Dickey's colloquy took on a "destructive" quality so as to result in "inevitable and overwhelming" prejudice. This is particularly so where the record shows that the jury resolved its deadlock shortly after being granted its request to have Jaleesa's testimony read to them in the deliberation room. Therefore, we conclude Appellant failed to establish that counsel's decision to call Dickey to the stand without first obtaining his guilty plea colloquy caused him prejudice at trial.

In Appellant's second issue, he argues trial counsel ineffectively failed to move *in limine* to preclude the Commonwealth from introducing evidence that he was the person who informed the prosecution that the police, in a separate investigation, had recovered the gun used on David McClenic in the present case. Without defense objection, the prosecution introduced trial counsel's letter at trial and indicated that the gun was recovered a block away from Appellant's address. During closing arguments, and again without objection, the prosecutor asked rhetorically how else trial counsel could have

known the recovered gun was the same one used in this shooting but to have been told so by Appellant. N.T. 2/28/14, at 70-71. The prosecution implored the jury to conclude that the reason Appellant knew it was the gun that killed McClenic was because he was the man who used it.

Appellant posited at the PCRA hearing that trial counsel's failure to file a motion *in limine* resulted in highly prejudicial testimony and argument by the prosecutor. In support of this argument, he relies on **Commonwealth v. Stenhach**, 514 A.2d 114 (Pa.Super. 1986), which held:

> We think the attorney-client privilege should and can be preserved even though the attorney surrenders the evidence he has in his possession. The prosecution, upon receipt of such evidence from an attorney, where a charge against the attorney's client is contemplated (presently or in the future), should be well aware of the existence of the attorney-client privilege. Therefore, the state when attempting to introduce such evidence at the trial, should take extreme precautions to make certain that the source of the evidence is not disclosed in the presence of the jury and prejudicial error is not committed.
>
> . . .
>
> [A] criminal defense attorney in possession of physical evidence incriminating his client may, after a reasonable time for examination, return it to its source if he can do so without hindering the apprehension, prosecution, conviction or punishment of another and without altering, destroying or concealing it or impairing its verity and availability in any pending or imminent investigation or proceeding. Otherwise, he must deliver it to the prosecution on his own motion. In the latter event, the prosecution is entitled to use the physical evidence as well as information pertaining to its condition, location and discovery but may not disclose to a fact-finder the source of the evidence.

***Id.***, at 120.

***Stenhach*** is distinguishable from the present case, as its holding both prohibits prosecutors from divulging to juries the source of physical evidence turned over by the defense and requires defense counsel to turn over such physical evidence. In that case, trial counsel was in possession of the murder weapon, thus creating the inference that it was obtained through the defendant.

Here, in contrast, trial counsel never possessed the gun in question, nor did trial counsel ever connect the possession of the firearm to Appellant. Indeed, the only purpose behind counsel's disclosure to the prosecution that the gun was used by someone else in a subsequent crime was to connect the gun's possession to someone other than Appellant. Such a purpose represented a reasonable trial strategy by counsel.

Finally, the prosecution never established that Appellant was the source of information regarding the gun's recovery and could only speculate in its argument to the jury that perhaps he was. As such, we discern no prejudice from counsel's performance in this regard.

Next, Appellant contends trial counsel ineffectively failed to lodge a Bad Character Evidence objection pursuant to Pennsylvania Rule of Evidence 404 when the prosecutor stated Appellant was "out there killing people" during her cross-examination of Appellant:

> **PROSECUTOR:** When is it that you found out that you were actually wanted?
>
> **APPELLANT:** Like a day – it came on the news, I think, the next day. Yeah like the next day.

**PROSECUTOR:** You mean the news, like over the radio or TV?

**APPELLANT:** The news TV. The broadcaster, he was on the TV. He was saying this guy is wanted for first degree murder and is armed and dangerous. I got scared.

**PROSECUTOR:** You go scared because you knew you did it.

**APPELLANT:** No, because cops out here killing people.

**PROSECUTOR:** No. You were out there killing people.

**DEFENSE COUNSEL:** Objection. She is yelling and try [sic] to badger the witness.

**THE COURT:** I will not tell you again. Just say "Objection" and I will rule. Hold your voice down. Have a seat. Continue.

**APPELLANT:** No, I was not out there killing people. I don't play with guns. I am not out there killing anybody.

**PROSECUTOR:** But the police are out there killing people, is that what you said?

**APPELLANT:** Yeah. You see that on TV. You see that on camera.

N.T., 2/28/14, at 83-84.

The trial court's preliminary instructions to the jury at the outset of trial included the following instruction:

**THE COURT:** Ladies and Gentlemen, bear the following in mind: Statements made by attorneys do not constitute evidence so that they are not binding on you. In fact, the questions which the attorneys ask the witnesses are not themselves evidence. Rather, it is the witness's answers which provide the evidence for your consideration.

N.T., 2/25/14, at 25. The court reiterated this instruction during its final charge to the jury:

> **THE COURT:** You, ladies and gentlemen, will recall that when I first addressed you in my preliminary instructions I told you that statements made by the attorneys did not constitute evidence and therefore were not binding on you.

N.T., 2/28/14, at 116.

Courts presume that jurors properly follow instructions given to them. *Commonwealth v. Freeman*, 827 A.2d 385, 413 (Pa.Super. 2003). Here, the prosecutor did not introduce bad character evidence with her statement during cross-examination, for her statement was not evidence, and the jurors were properly instructed as such both before and after the exchange in question. Accordingly, the PCRA court correctly found no merit to Appellant's ineffectiveness claim stating otherwise.

Finally, Appellant contends that the sum of counsel's errors prejudiced him under the ineffectiveness standard so as to warrant a new trial. Our Supreme Court explained the principle of cumulative prejudice as follows:

> We have often held that no number of failed claims may collectively warrant relief if they fail to do so individually. However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed.

*Commonwealth v. Spotz*, 18 A.3d 244, 321 (Pa. 2011) (citations, brackets, and quotation marks omitted).

- 21 -

We have found that neither counsel's failure to review and assess Dickey's guilty plea colloquy prior to calling him to the witness stand, nor counsel's failure to file a motion *in limine* to preclude the prosecution from informing the jury that defense counsel enabled the location of the murder weapon, on its own prejudiced Appellant. Even when considering those two occurrences in the aggregate, we find the outcome of trial would not have changed, particularly where the jury clearly found Jaleesa Thomas' testimony to be credible, where no evidence identified Appellant as the source of information leading to the location of the gun, and the jury learned of Appellant's one-year flight reflecting consciousness of guilt. Accordingly, because we see no danger of cumulative prejudice based on our findings on the first and third issues, Appellant is not entitled to relief on a cumulative prejudice standard.

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/14/2020